UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KDK ENTERPRISES, Inc. <br> Plaintiff, <br><br> v. <br><br> TRAVELERS CASUALTY AND SURETY <br> COMPANY OF AMERICA <br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO. 05-11509-RCL <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF, KDK ENTERPRISES, INC.'S MOTION FOR SUMMARY JUDGMENT ON COUNT I OF THE COMPLAINT**

Now comes the Plaintiff, KDK Enterprises, Inc. ("KDK"), and hereby respectfully requests that this Honorable Court enter Summary Judgment on Count I of the Complaint for breach of Contract and award KDK $612,230.00 plus interest at the statutory rate from the date of breach, February 27, 2005, the date upon which the Defendant breached its obligations under the payment bond forming the basis of the Defendant's obligations in this matter.  In sum, the Defendant was obligated by the terms of its own bond to either pay KDK's claim or provide KDK with a explanation of the disputed amounts within 45 days of KDK's demand of January 13, 2005 and Defendant's failure to do so constitutes a material breach of contract entitling KDK to judgment on the full amount of its claim as a matter of law. See Exhibit A[1] (p. 2, Article 6) and _National Union Fire Insurance Co. v. Wadsworth Golf Construction Co._, 160 Md.App. 257, 863 A.2d 347 (2004) *aff'd*, _National Union v. David A. Bramble, Inc_. 388 Md. 195, 879 A.2d 101 (2005) (attached hereto as Exhibits B and C).  Further support hereof is set forth below:

---

[1] For convenience, all Exhibits are attached to the hard copy of this document.  Due to their size, said Exhibits were not scanned with the express permission of the Court.

1

## **FACTS**

1. The Plaintiff, KDK Enterprises, Inc. (hereinafter "KDK") is a Massachusetts corporation with a usual place of business in Newton, Middlesex County, Massachusetts. Affidavit of Boris Kutikov at ¶ 1.

2. The Defendant, Travelers Casualty and Surety Company of America (hereinafter "Travelers") is an insurance company duly licensed to transact business in the Commonwealth of Massachusetts with a principal place of business in Hartford, Connecticut. Complaint and Answer at ¶ 2, attached hereto as Exhibits D and E.

3. This matter arises from a construction project for the Massachusetts Housing Finance Agency ("MHFA") as owner and interim asset manager for the United States Department of Housing and Urban Development known and referred to as "MHFA Project #96-006 Academy Homes II, Boston, Suffolk County, Massachusetts (the "Project"). Affidavit of Boris Kutikov at ¶ 2.

4. KDK was a painting subcontractor to ODF/Hoon/Peabody, Joint Venture ("OHP"), as general contractor on the Project. Exhibit F; Affidavit of Boris Kutikov at ¶ 2.

5. Travelers is the payment bond surety to OHP. A copy of said bond is attached hereto as Exhibit A.

6. The base amount of the subcontract between KDK and OHP for the Project is $782,000.00. A copy of said Subcontract is attached as Exhibit F; Affidavit of Boris Kutikov at ¶ 4.

7. KDK performed extra work on the Project totaling $1,171,254.00. Affidavit of Boris Kutikov at ¶4; see the attachments to Exhibit H.

8. KDK has received payment and applied credits on account totaling $1,341,024.00 leaving a balance of $612,230.00 exclusive of court costs and statutory interest. Affidavit of Boris Kutikov at ¶ 5.

9.   KDK made a good and sufficient demand on Travelers on or about January 13, 2005 pursuant to the terms of the bond (Articles 4 and 5), Exhibits G and A. Affidavit of Boris Kutikov at ¶ 7.

10.  KDK further cooperated with Travelers and provided Travelers with additional information, including a completed "Claim Form" on or about March 16, 2005, a copy of which is attached hereto as Exhibit H, Affidavit of Boris Kutikov at ¶ 8.

11.  On or about May 5, 2005, KDK sent a follow up letter to Travelers inquiring into the status of payment. Exhibit I, Affidavit of Boris Kutikov at ¶ 9.

12.  Travelers failed and refused to make payment under the bond as demanded by KDK pursuant to the terms of the bond, Article 6.2. Exhibit A, Affidavit of Boris Kutikov at ¶ 10.

13.  Also in breach of its contractual obligations under the bond, Travelers failed and refused to issue a timely decision on KDK's claims pursuant to the terms of the bond, Article 6.1, a copy of which is attached hereto as Exhibit A, Affidavit of Boris Kutikov at ¶ 10.

14.  As a result thereof, KDK is entitled to judgment on its claims as a matter of law at this time.

## DISCUSSION

**I. Introduction**

The ultimate question before the Court is whether Travelers' failure to satisfy or even respond to KDK's claims under Travelers' payment bond for work performed on the Academy Homes II project, within the 45 day time limit specified by Article 6 of the Bond, amounts to a material breach of contract and effective waiver by Travelers of any right to now dispute KDK's claims.

**II. Summary Judgment Standard**

Summary Judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

3

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Seaboard Surety Co. v. Town of Greenfield</u>, 370 F.3d 215, 218 (1st Cir. 2004). A genuine issue exists when "the evidence on the point is such that a reasonable jury, drawing favorable inferences, could resolve the fact in the manner urged." <u>Blackie v. State of Maine</u>, 75 F.3d 716, 721 (1st Cir. 1996). A factual issue is "material" if it "has the potential to alter the outcome of the suit under the governing law." *Id*. "[C]onclusory allegations, improbable inferences, and unsupported speculation," however, are insufficient to establish a genuine dispute of fact. <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).

**III. The Miller Act is Inapplicable to the Private Payment Bond Issued by Travelers**

The Miller Act, 40 U.S.C. §3131, requires a general contractor to obtain a payment bond securing its performance of payment obligations to subcontractors "[b]efore any contract of more than $100,000 is awarded for the construction, alteration, or repair of **any public building or public work of the Federal Government...**" 40 USC § 3131(b) (emphasis added). As will be demonstrated, the project in issue here, for which Travelers is a surety and KDK is a subcontractor, is not a "public building or public work of the Federal Government." Thus, the Miller Act is not applicable to this dispute.

When determining the applicability of the Miller Act, the analysis usually focuses on what constitutes "<u>public work</u>" for the "<u>Federal Government</u>" in the context of the Miller Act. *See* William G. Donaldson, *What Constitutes "Public Work" Within Statute Relating to Contractor's Bond*, 48 A.L.R.4th 1170 at Part II and III (2006). Attached hereto as Exhibit J. Simply because there is some involvement of the federal government or its agents in a construction contract does not necessarily bring the project within the Miller Act. *See* <u>United States ex rel. Kelly's Tire and Supply Co., Inc. v. Gordon</u>, 468 F.2d 617 (5th Cir. 1972); <u>United States ex rel. Hutto Concrete Company, Inc. v. Magna Building Corporation</u>, 305 F.Supp. 1244 (S.D.Ga., 1969) (holding the

4

Miller Act *inapplicable* to low-rent housing projects owned and administered by the local housing authority even though the project was funded in part by the federal government).

In *Hutto*, the court focused on the language in the federal statute, 42 U.S.C. § 1401, that vested in local housing agencies, administrative responsibility for the low-rent housing program. *Id*. (citing 42 U.S.C. § 1401 *ommitted by* The Housing and Community Development Act of 1974, Pub. L. No. 93-383 § 3066, 88 Stat. 633 (1974) (current version at 42 U.S.C. § 5301 (1974))). Although 42 U.S.C. § 1401 does not apply to this dispute, the terms of the agreement between the U.S. Department of Housing and Urban Development (HUD) and the Massachusetts Housing Finance Agency (MHFA) (the "Agreement") are nonetheless critical to determining the relationship between the state and federal entities.

A. <u>The Academy Homes II Project was not "Public Work" within the meaning of The Miller Act.</u>

In addressing a Massachusetts "public works" statute, G.L. c. 149 § 29, the Massachusetts Appeals Court held that the mere fact that a state agency (the MHFA) had financed construction of low to moderate income housing for a private corporation, this was not enough to make that project "public" so as to bring it within the bonding statute. <u>Salem Bldg. Supply Co. v. J.B.L. Constr. Co</u>., 10 Mass.App.Ct. 360, 362 (1980). The court went on to say, St.1966, c. 708, §5(b) (the statute establishing the MHFA), "makes clear that the statute is designed to encourage *private* enterprise to build needed housing." *Id*. (emphasis added).

Similarly, here, HUD's primary intention in engaging the MHFA on the project at issue was to provide needed, affordable housing; and rather than continue to own and manage such multifamily properties, HUD allowed the MHFA to "manage and dispose of such [HUD-owned] properties" because of the MHFA's "unique capabilities, resources, and authority." (Agreement Between HUD and MHFA, Recitals at 2, attached hereto as Exhibit K).

5

Furthermore, HUD was not the primary owner or operator of the property because the properties were turned over to a private corporation, New Academy Homes, LLC, and the individual tenants for their use and management. The real estate is not now owned by Massachusetts or the United States. *See* Exhibit L, *MassHousing Demonstration Disposition Fact Sheet* at 2[2],; and Exhibit M, *Business Partners - The MassHousing/HUD Demonstration Disposition Program*[3] (announcing completion of Academy Homes II, and other, similar low-income housing projects).

> According to MassHousing:
>
> > HUD provided funds for the [Academy Homes II] project, while MassHousing oversaw all day-to-day operations, including the awarding of construction contracts, resident relocation during construction, and the transfer of completed properties to resident-owned organizations.
> > . . . .
> > Residents of the 11 developments took an active role in the renovation and construction plans of their developments. One of the program's goals was to empower residents to control their homes. Typically, private landlords own subsidized rental housing; through Demo Dispo, ownership was transferred to the residents. *Id.* (emphasis added).

B. The MHFA was the Principle Owner and Manager of the Academy Homes II Project, not the Federal Agency of HUD.

For the Miller Act to apply, not only must the construction project be of a "public" nature, it must also be "a work of the Federal Government." In this case, although HUD foreclosed on the properties making up the Academy Homes II Project, HUD chose to pass on ownership and management responsibilities to MHFA, a Massachusetts state agency. *See* Exhibit K, see also, Exhibits L and M. The purpose of the Agreement between HUD and MHFA (the "Agreement") and the National Housing Act, 12 U.S.C. § 1702, was to allow HUD to "delegate to state agencies the performance of management and disposition" of housing projects acquired by HUD as a result of assignment or foreclosure "in the least costly manner among the available

---

[2] Available at: http://www.masshousing.com/imageserver/BusinessPartners/DemoDispo_FactSheet.pdf
[3] Available at: http://www.masshousing.com/

alternatives." (*See* The Agreement Recitals at 1-2, attached hereto as Exhibit K). It is clear from these Recitals that the National Housing Act and the Agreement were intended to allow HUD to dispose of public housing projects with the least possible cost to, and involvement of, Federal agencies, by allowing state and local agencies and corporations to take over the administration of projects such as the Academy Homes II project, which is the focus of this action. (*See* The Agreement Recitals at 1-2, attached hereto as Exhibit K).

Furthermore, HUD terminated its existing management contracts via the HUD-MHFA Agreement, which sets out a plan whereby, as of May 31, 1994, all "Existing Management Contracts" between HUD and its "existing management agents" were terminated. (Agreement §§ 2.2.1; 2.2.2). Following termination of the HUD management contracts, it was MHFA's obligation to enter into new management contracts "on substantially the same . . . terms," for the continued management of the developments. *See* Agreement § 2.2.3. Thus, in effect, HUD was handing over the responsibility of management to MHFA per the terms of their Agreement. *See* Id.  Furthermore, subsequent sections of the Agreement provide that MHFA was to hire and oversee numerous additional individuals and teams including: architects, managers, financial and community service officers, security services, and perhaps most significantly, solicitation of contractors for completion of repair work. (*See* Agreement §§ 2.5-2.8.3). Thus, it is clear that HUD was divesting itself of its ownership and management responsibilities related to the Academy Homes II properties.

In addition to the elements of MHFA management of the project and exclusion of the Miller Act from the list of applicable federal requirements, the bond issued by the Travelers listed the MHFA as owner of the properties subject to the bond. (*See* Payment Bond, attached as A). So again, it is evident that all of the parties to this construction project were aware of the local nature of the project and could not have contemplated it as a "public work of the Federal Government." *See The Miller Act*, 40 U.S.C. § 3131(b). This is especially true given the nature

and purpose of the project. This was not a project in which the federal government contracted to repair or build a U.S. Post Office, federal courthouse or other clearly federally owned and operated property, but rather, was a housing project designed to assist local Massachusetts residents find affordable housing. *See* U. S. ex rel. Brown-Wales Co. v. Leff, 36 F.Supp. 930, 931 (D.Mass. 1941); U.S. ex rel. Olson v. W.H. Cates Const. Co., Inc., 972 F.2d 987, 989 (8th Cir. 1992).

The National Housing Act, 12 U.S.C. § 1713(l), "broadly empowers the Secretary [of HUD] . . . to deal, make contracts for the management of, or establish suitable agencies for the management and disposition of any properties that are acquired by HUD. . . ." *Id*. at 1. Thus, HUD has chosen to essentially wash its hands clean of the multifamily properties in Massachusetts by "utilizing and joining" the MHFA to ". . . assist HUD to fulfill its statutory obligations to provide decent and affordable housing, and at the same time, dispose of HUD-owned properties in the least costly manner among the alternatives available." *Id*. HUD had no interest in maintaining the properties as federal government housing, nor did it want the primary responsibilities of managing the construction at issue here, which is why those responsibilities were contracted away to the Massachusetts State agency of the MHFA. *See Id*. at 1-2.

In contrast, one Massachusetts holding on the applicability of the Miller Act to interstate highway construction found a lack of "verifying facts . . . to illustrate that the project was a state project." United States ex rel. Motta v. Able Bitumous Contractors, Inc., 640 F.Supp. 69, 71 (D.Mass. 1986). The *Motta* court was not persuaded that "highways such as I-495 are universally recognized as state property and responsibility," but instead focused on the contractor's contract with the federal government and the bond that was "executed in accordance with the provisions of the Miller Act." *Id.* However, in *ex rel. Motta*, the defendant had "executed and delivered a bond to the United States" in accordance with the Miller Act, as opposed to the present case, in which the MHFA was listed as the sole owner of the bonded

8

property while HUD was merely listed in a rider as a joint obligee, "in [HUD's] capacity as a source for money to the Owner . . . ." *Compare* Motta v. Able, at 70 *with* Payment Bond, Dual Obligee Rider, attached hereto as Exhibit N.  The text of the Dual Obligee Rider at issue here states that,

> the Performance Bond executed in favor of MASSACHUSETTS HOUSING FINANCE AGENCY, . . . **Owner**, . . . shall now include as an Obligee with the Owner, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD), in its capacity as a source of money **to the Owner** for exclusive use on the project aforesaid. (Emphasis added).

This language serves to clearly indicate that the parties all contemplated MHFA as owner of the Academy Homes II property, with HUD merely serving as a financial support for the project; and as said before, mere financial support for a construction project does not necessarily make it a public work of the federal government under the Miller Act. *See* United States ex rel. Hutto Concrete Company, Inc. v. Magna Building Corporation, 305 F.Supp. 1244 (S.D.Ga., 1969).

    It should be noted that the a Massachusetts Superior Court, in a case involving the same project and the same performance bond as the present one at issue here, recently held that a subcontractor had failed to meet its burden of proving the inapplicability of the Miller Act to the HUD funded low-income housing projects. *Waltham Lime & Cement Company v. Peabody Constr. Co., Inc.*, Civil Action No. 03-01407 at 2 (Mass.Super., Jan. 10, 2005) (attached hereto as Exhibit O).  However, *Waltham* Lime should not control the outcome here because the Massachusetts Superior Court decision in *Waltham Lime* specifically noted that the record on summary judgment "d[id] not include any details about the legal relationship between MHFA and the U.S. Department of Housing and Urban Development." *Waltham Lime*, Civil Action No. 03-01407 at 2 (Mass.Super., Jan. 10, 2005).

    As demonstrated above, when the "details of the legal relationship between MHFA and HUD" are examined, it is clear that HUD and the MHFA specifically enumerated the federal

9

statutes they desired to be made applicable to their relationship by listing them in "Exhibit D" of the HUD-MHFA agreement. Agreement Between HUD and MHFA, "Exhibit D" as provided with Exhibit K and also attached hereto as Exhibit P for convenience.  In addition, notably absent from this list of "Federal Requirements" is the Miller Act. *See Id*.  Therefore, where the list of applicable "Federal Requirements" does provide "details about the legal relationship between MHFA and [HUD]" and these details clearly indicate the parties intention not to include the Miller Act on the project in contradistinction to the findings of the Massachusetts State Court.  *Compare* Waltham Lime, Civil Action No. 03-01407 at 2 (Mass.Super., Jan. 10, 2005).

      C. The Parties Elected *Not* to Make The Miller Act Applicable to this Bond.

As discussed briefly above, the HUD-MHFA Agreement specifically enumerated, in "Exhibit D", the federal statutes that would apply to the housing project. *See* 2.9.  Not surprisingly, "Exhibit D" of the Agreement does not include amongst the more than thirty federal requirements, any mention of the Miller Act.  The Agreement confirmed this limitation of applicable federal requirements in section 2.1 which clearly states that "[a]ll procurement actions under the Agreement shall be governed *solely* by the procedures described in this Section 2.1 and the Federal requirements set forth on Exhibit D..."  The contract could not have been clearer in expressing the parties' intentions to limit the governing federal provisions to those listed in Exhibit D.  Therefore, given the fact that management functions for the project were delegated to a state authority (MHFA) and the Agreement between HUD and MHFA specifically excluded the Miller Act from its list of federal statutory requirements, the Miller Act cannot apply to this local construction project, intended to benefit local, low-income residents of Massachusetts.

**IV. The Academy Homes II Project does not appear to be a State Public Construction Contract subject to M.G.L. c. 149, §29, making it a private bond per M.G.L. c. 149, §29A.**

      For the same and similar reasons enunciated above, the payment bond at issue does not appear to be subject to the Massachusetts statutory requirements of M.G.L. c. 149, §29.  Chapter

149 § 29 is the Massachusetts, state version of the Miller Act (sometimes known as a "Little Miller Act"), and governs bonds issued on construction projects involving "public buildings or other public works."  Just as the Academy Homes II project was not "public" in nature for purposes of the Miller Act, it was also a private project for the purposes of M.G.L. c. 149. *See* <u>Salem Bldg. Supply Co. v. J.B.L. Constr. Co.</u>, 10 Mass.App.Ct. 360, 362 (1980) (St.1966, c. 708, §5(b) (the statute establishing the MHFA), "makes clear that the statute is designed to encourage *private* enterprise to build needed housing.").

Of great significance to this issue is the understanding of the MHFA attorneys themselves that this was not an M.G.L. c. 149 project.  Kevin Gavin, Esq., an attorney for MHFA, by letter to KDK's counsel, acknowledged that, "[l]ike other projects in the program, Academy Homes II was not considered to be subject to the procurement or bonding requirements of a state public construction project under M.G.L. c. 149." Letter from Attorney Kevin Gavin of the *Massachusetts Housing Finance Agency* (Dec. 20, 2005) attached hereto as Exhibit Q.  Thus, not only was the Academy Homes II project and corresponding payment bond not governed by the Miller Act, so too is the project not governed by M.G.L. c. 149, §29 as a public project of the Commonwealth.  Rather, the Payment Bond at issue was simply a private bond knowingly entered into, as such, by all parties involved.  In addition, it should be noted that Travelers was a named Defendant in the <u>Waltham Lime</u>, Civil Action No. 03-01407 at 2 (Mass.Super., Jan. 10, 2005) (Attached hereto as Exhibit O) and specifically maintained in the action that the payment bond in question (the same bond in issue here), was not a State bond subject to M.G.L. c. 149, §29.  Travelers should be bound by its position and should not be permitted to take an inconsistent position herein simply to defeat summary judgment.

Wherefore, having established that the bond in issue is not subject to the Miller Act and probably not subject to M.G.L. c. 149, §29, it is clear that said payment bond is simply a private

bond and, in such case, is unquestionably only subject to the terms of the bond itself. See M.G.L. c. 149, §29A.

**V. Failure to Respond to KDK's Claim within the Time-Frame Specified in the Bond Constitutes a Waiver of any Right to Subsequently Dispute the Claim as a Matter of Law.**

After completion of work, and having not received payment in full as provided by contract, KDK gave notice of claim to OHP's payment bond surety, Travelers, on or about January 13, 2005. Exhibit G and Affidavit of Boris Kutikov, ¶s 6-7. KDK followed up with additional information and inquires under dates of March 18, 2005 and May 5, 2005. Exhibits H and I. In breach of contract and in violation of the terms of the bond, specifically Articles 6.1-6.2, which expressly requires the surety to promptly respond to a subcontractor's claim "within 45 days after receipt of the claim," Travelers failed and refused to dispute any of KDK's claim detailed in the January 13, 2005 letter and further failed and refused to "pay or arrange for payment of any undisputed amounts" claimed. *See* Payment Bond, Articles 6.1-6.2 attached hereto as Exhibit A. Therefore, due to Travelers refusal or failure to respond to KDK's good faith claim for payment in accordance with the terms of their payment bond on the OHP project, Travelers has waived any right to dispute those claims now.

   A. <u>The principles of contract interpretation applied to the bond in *National Union v. David A. Bramble, Inc.* are well-established and insightful tools for interpreting the identical terms of the bond in this case.</u>

Although the case law in Massachusetts is slim regarding the effect of the terms in private bonds on sureties and contractors due to the Massachusetts General Laws chapter 149, § 29 provision of extensive regulations on bonding of public construction projects, the Court of Special Appeals of Maryland, recently heard a case involving a bond and fact pattern nearly identical to that of this case. <u>National Union Fire Insurance Co. v. Wadsworth Golf Construction Co.</u>, 160 Md.App. 257, 863 A.2d 347 (2004) *aff'd*, <u>National Union v. David A. Bramble, Inc</u>. 388 Md. 195, 879 A.2d 101 (2005) (attached hereto as Exhibits B and C).

In *National Union*, both the Court of Special Appeals of Maryland, as well as Maryland's highest court, held that a surety that failed to answer a subcontractor's claims within 45 days as required by the terms of the payment bond was precluded from disputing those claims. *National Union*, 879 A.2d at 111, *aff'g*, 863 A.2d at 357. The court entered judgment against the surety even though the surety may have had valid disputes to paying certain portions of the claim because the bond (which, in all material respects, was identical in form and language to the bond in this case (see below)) required the surety to "specifically delineate the grounds underlying the dispute." *National Union*, 879 A.2d at 109, *aff'g*, 863 A.2d at 357. The disputed paragraphs in the bond at issue in *National Union* are identical to Article 6 in Travelers payment bond at issue here; both of which state:

> **6**  When the claimant has satisfied the conditions of Paragraph 4, the Surety shall promptly and at the Surety's expense take the following actions:
>
> **6.1**  Send an answer to the Claimant, with a copy to the Owner, within 45 days after receipt of the claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed.
>
> **6.2**  Pay or arrange for payment of any undisputed amounts.

*Compare* Payment Bond, Article 6.1-6.2 (attached hereto as exhibit A) *with National Union*, 879 A.2d at 103-104. The court explained its holding by reasoning that "as a practical matter the suppliers and small contractors on large construction projects need reasonably prompt payment for their work and materials in order for them to remain solvent and stay in business." *National Union* 879 A.2d at 111, quoting *General Accident Insurance Co. or America v. Merritt-Meridian Construction Corp.*, 975 F.Supp. 511, 516 (S.D.N.Y. 1997). "The very purpose of securing a surety bond contract is to insure that claimants who perform work are paid for their work in the event that the principal does not pay." *National Union*, 879 A.2d at 111, quoting *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 723 (4th Cir. 2000).

13

The court was not persuaded by the surety's arguments that failure to respond was not an implied waiver of a right to defend against contractors' claims, or that because the bond did not dictate what the consequences would be for not answering a claim, there could be no adverse consequences. *National Union*, 863 A.2d at 353. Rather, both appellate courts held for the contractor "based solely on an interpretation and application of the language of the payment bond." *National Union*, 879 A.2d at 106; and *see* 863 A.2d 347. The courts found that the sureties concededly breached the requirements set forth in the bond for defending against a contractor's claim, which therefore, "foreclosed [the surety] from raising defenses to their non-payment of [the contractor's] claims" after the 45-day window for an answer had closed. *National Union*, 879 A.2d at 111, *aff'g,* 863 A.2d at 352.

The surety in *National Union* argued that because they failed to respond to the parts or amounts of the claim that they disputed, this simply "render[ed] the entirety of the claim in dispute." *National Union*, 879 A.2d at 110. The court specifically rejected such an interpretation because the terms of Article 6 of the bond (identical to Article 6 of the bond at bar) specifically require a response with explanation of any such dispute within 45 days. *Id*. "If we were to adopt the sureties' interpretation of Paragraph 6, we would be rendering the 45-day time requirement essentially nugatory. . . . This runs afoul of our long-standing tenet of contractual interpretation that provisions of a contract are to be interpreted, if possible, so as to give effect to all." *National Union*, 879 A.2d at 110.

Applying the simple principles of *National Union* and the cases cited therein, Travelers was bound by clear and concise terms of a payment bond that required Travelers to "promptly pay," or at the very least provide an explanation for disputing, KDK's claims for payment within 45 days of receiving KDK's claim. Travelers failed to make any attempt at paying, arranging for payment, or explaining to KDK why Travelers disputed payment on the bond, which now

precludes Travelers from disputing KDK's claims, nearly one and one half years after the claims were originally submitted.

> B. Applying well established rules of contract interpretation, and according the plain meaning of the terms to the bond at issue, clearly demonstrates that Travelers is in breach by failing to answer KDK's bond claims.

"[C]ourts interpret 'indemnity agreement[s] in accordance with the rules governing the construction of contracts generally.'" *John T. Callahan & Sons, Inc. v. Dykeman Elec. Co., Inc.*, 266 F.Supp.2d 208, 236 (D.Mass., 2003) (citing *Andre Construction Association, Inc. v. Catel, Inc.,* 293 N.J.Super. 452, 681 A.2d 121, 123 (1996)). "If language used by a bond is plain and unambiguous the bond should be interpreted like any other contract to determine the intention of the parties." *John T. Callahan & Sons,* 266 F.Supp.2d at 236 (quoting *Carriage Town, Inc. v. LandCo, Inc.*, 998 F.Supp. 646, 648 (D.S.C., 1998)). The rule is no different in Massachusetts: "[I]ndemnification provisions 'are to be interpreted like any other contract, with attention to language, background, and purpose.'" *American Site Developers, Inc. v. MRP Site Development*, 63 Mass.App.Ct. 529, 534, 827 N.E.2d 251, 255 (2005) (quoting *Herson v. New Boston Garden Corp.,* 40 Mass.App.Ct. 779, 782, 667 N.E.2d 907 (1996)). "A policy of insurance whose provisions are plainly and definitely expressed in appropriate language must be enforced in accordance with its terms." *Cody v. Connecticut General Life Ins. Co.*, 387 Mass. 142, 146 (1982) (quoting *Hyfer v. Metropolitan Life Ins. Co.*, 318 Mass. 175, 179, 61 N.E.2d 3 (1945)).

"In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable: (a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." *Lembo's Supermarkets v. Messina*, 55 Mass.App.Ct. 1109 (2002) (citing RESTATEMENT (SECOND) OF CONTRACTS § 203 (1981)). "A contract should also be interpreted in a manner which avoids resulting in meaningless words." *Waters Corp. v. Millipore Corp.*, 2 F.Supp.2d 66, 75 (D.Mass. 1997) (citing *Gibraltar Financial Corp. v.*

*Lumbermens Mutual Casualty Co.,* 400 Mass. 870, 872 (1987)). Thus, the plain meaning of the terms of an enforceable contract – the payment bond at issue here – can lawfully be given effect by precluding Travelers from now making any challenges to KDK's bond claims outside of the 45 day window provided in such bond.

Travelers is not inexperienced in interpreting and holding parties to the terms of its bonds. *See Travelers Casualty Co. of America, Inc. v. Long Bay Management Co.*, 58 Mass.App.Ct. 786, 790, 792 N.E.2d. 1013 (2003) (adopting Travelers "plain reading" of a bond and its "incorporation by reference" language to incorporate an arbitration clause found in the construction contract). "To restrict, as [the contractor] would have it, the incorporation by reference language in the bond . . . does violence to the bond's terms." *Id*. Surely if Travelers has no problem interpreting incorporation by reference language in its bonds to incorporate terms found in other, related documents, it should come as no surprise to Travelers that KDK now wishes to merely hold Travelers to the clear, unequivocal language on the face of its bond for the Academy Homes II project.

**VI. Even if the Miller Act Were to Apply, the Terms of a Bond are Binding when not in Conflict with the Act.**

The Miller Act was intended to preempt "relief under state lien statutes," and not forclose any additional contractual provisions that the parties might decide to include in their bonds. *In re Bowles*, 318 B.R. 129, 141 n. 12 (Bkrtcy.E.D.Wis., 2004). Courts have held that the Miller Act was not entirely comprehensive, nor was it intended to preempt the entire field of surety regulation. *See K-W Industries, a Div. of Associates Technologies, Ltd. v. National Surety Corporation*, 855 F.2d 640, 642 n. 3 (C.A.9th, 1988) ("[T]he Miller Act contains no preemption clause. . . . Nor does [Defendant] argue that Congress intended the Miller Act to occupy the entire field of regulating sureties of bonds for federal construction projects. The Act simply requires the posting of a payment bond of a specified amount; it neither regulates the conduct of

16

sureties nor ensures that such conduct remains unregulated."); *see also* <u>Alvarez v. Insurance Company of North America</u>, 667 F.Supp. 689, 695 (N.D.Cal., 1987) (citing <u>United States for the Use of Building Rentals Corp. v. Western Casualty and Surety Co.,</u> 498 F.2d 335, 338 n. 4 (9th Cir., 1974) ("The operation of the Miller Act and various authorities support the conclusion that the Miller Act does not totally occupy the field [of surety regulation]. . . .  Federal courts have also found it necessary to rely on state law to fill in the interstices of the Act. . . . Neither the alleged comprehensiveness of the regulatory scheme, nor the regulations, evidence a congressional intent to occupy the area regulated by the California statute.").

Here, even if the Miller Act were to apply to the payment bond at issue, there is no "statutorily required provision" regarding the time limits on sureties to respond to claims on the bond.  Section 3131 of the Miller Act does not specify the time within which a surety must answer the claims of a subcontractor.  Similarly, section 3133 also does not establish such a time frame for the surety's response.

On the other hand, the terms of the bond issued by Travelers do specifically include a time frame within which Travelers was required to respond to the claims of KDK:  "45 days after receipt of the claim." Payment Bond, Article 6.1-6.2 (attached hereto as exhibit A).  While it has been held by Massachusetts courts that "[a] contract cannot be more expansive that the statute under which it was executed", here the Miller Act merely provides certain limitations on such payment bonds - none of which explicitly or implicitly limit the parties from setting a time limit for the surety to respond to claims. *See and compare* <u>Bierig v. Everett Square Plaza Associates</u>, 34 Mass.App.Ct. 354, 366, 611 N.E.2d 720 (1993) (finding a low income housing contract that set a rent *ceiling* for all tenants (with any level of income) in conflict with an act that only provided a rent *floor* for market tenants, and which provided the MHFA with discretion to increase rent levels for [higher income] market tenants). Furthermore, here, the payment bond in question does not "attempt to accomplish indirectly what the statute expressly prohibits", nor is it

"contrary to the meaning and purpose of the statute." See Coughlin v. Royal Indemnity Co., 244 Mass. 317, 319, 138 N.E. 395 (Mass. 1923).

Thus, even if the Miller Act were to be found applicable to this bonding situation, because there is no conflict between the contractual based terms that were made a part of the bond and the statutory mandates of the Miller Act, the supplemental terms of the bond should remain enforceable. See generally K-W Industries, a Div. of Associates Technologies, Ltd. v. National Surety Corporation, 855 F.2d 640, 642 n. 3 (C.A.9th, 1988); Alvarez v. Insurance Company of North America, 667 F.Supp. 689, 695 (N.D.Cal., 1987) (citing United States for the Use of Building Rentals Corp. v. Western Casualty and Surety Co., 498 F.2d 335, 338 n. 4 (9th Cir., 1974); see also Heroux v. Shelby Mutual Insurance Co., 18 Mass.App.Ct. 925, 926, 465 N.E.2d 1211 (1984) (holding that so long as automobile insurance policy does not conflict with statute by excluding mopeds from its policy, it remains an enforceable policy and the insurer can properly deny the insured's claim); Reynolds Bros., Inc. v. Commonwealth, 412 Mass. 1, 5, 586 N.E.2d 977 (1992) ("[T]o the extent there may be conflict between the expressed contract and the statutorily required provision, the required provision controls.").

The lack of any time frame in the Miller Act for responding to or making payments on valid bond claims does not justify or excuse Travelers' failure to respond in accordance with the clear terms of its bond. In other words, by remaining silent on this issue, it logically follows that Congress did not intend to affirmatively grant sureties the ability to take an infinite amount of time to respond to their claims on Miller Act bonds, especially when such a delay violates the express terms of the bond.

The terms of the Travelers payment bond merely supplement the Miller Act's requirements. One of these supplemental terms was to require the surety, Travelers, to answer claims filed by a subcontractor such as KDK within 45 days of its receipt of KDK's claims. There can be no dispute about the interpretation of Article 6 of the bond; the meaning is clear

18

and simple. As discussed above, even if the Miller Act is applicable to this construction project, enforcing this term as stated in the bond itself, would in no way hinder the application of the Miller Act. Therefore, because the Miller Act can be fully enforced alongside the bond without conflict, there is no reason to ignore the contractual agreement of the parties as manifested in the clearly written terms of their bond.

**VII. The Legislative Purpose and Intent in Enacting the Miller Act Was To Protect Persons Supplying Labor and Materials, Not Sureties that Delay Responding to Valid Claims.**

"The Miller Act represents a congressional effort to protect persons supplying labor and material for the construction of federal public buildings in lieu of the protection they might receive under state statutes with respect to the construction of nonfederal buildings." *United States ex rel. Sherman v. Carter*, 353 U.S. 210, 216 (1953); *see U.S. ex rel. Water Works Supply Corp. v. George Hyman*, 131 F.3d 28, 31 (1st Cir. 1997). "The essence of its policy is to provide a surety who, by force of the Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material." *Id*. at 216-217; *see also Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 107 (1944) (the Congressional purpose of the Miller Act was, "to protect those whose labor and material go into public contracts.").

Here, Travelers chose to ignore KDK's timely claims for payment under the terms of Travelers' Payment Bond. Now, despite choosing to ignore KDK's claims for payment as called for in the bond provided by Travelers, Travelers wishes to use the Miller Act as an excuse for indefinitely delaying any response to the good faith claims filed by the subcontractors on the Academy Homes II project. It would be antithetical to the Miller Act's purpose, to permit a surety such as Travelers to invoke an Act, designed to protect providers of materials and labor, as a defense for intentionally delaying the surety's response to the claims of a subcontractor. *See K-W Industries v. National Surety Corp.*, 855 F.2d 640 (9th Cir. 1988) (finding "nothing in the Miller Act or in its legislative history to suggest that Congress intended the Act to protect

19

sureties from liability for torts or other violations of state laws or regulations that they may commit . . . .")

Sureties must not be permitted to rely on the absence of a time frame for responding to claims, in the Miller Act, as a means of avoiding the clear terms of a valid payment bond (providing for such a time frame) and as a means of avoiding payment for the materials and labor provided to public building projects - payment for which, the Miller Act was meant to protect.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the Plaintiff, KDK Enterprises, Inc. asks that this Honorable Court enter summary judgment on Court I of the Complaint and grant judgment against the Defendant, in the amount of $612,230.00 plus interest at the statutory rate from the date of breach, February 27, 2005.

|  |  |
|---|---|
|  | KDK ENTERPRISES, INC.<br>By its Attorneys, |
| Date:   8-4-06 | __/s/ James G. Grillo_____<br>Patrick J. Sullivan, Esq., BBO# 548752<br>James G. Grillo, Esq., BBO# 638730<br>Heafitz & Sullivan<br>56 Chestnut Hill Avenue<br>Boston, MA 02135<br>(617) 562-1000 |