UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
)
KDK ENTERPRISES, Inc.                          )
     Plaintiff,                               )
                                               )
v.                                             )
                                               ) CIVIL ACTION NO. 05-11509-RCL
TRAVELERS CASUALTY AND SURETY                  )
COMPANY OF AMERICA                             )
     Defendant.                               )
_____)

**PLAINTIFF, KDK ENTERPRISE'S MOTION TO FILE REPLY AND REPLY IN SUPPORT OF SUMMARY JUDGMENT ON COUNT I OF THE COMPLAINT**

Now comes the Plaintiff, KDK Enterprises, Inc. ("KDK"), and hereby respectfully requests that this Honorable Court accept the following concise Reply in support of Summary Judgment on Count I of the Complaint to respond to certain factual issues raised by the Defendant in its Opposition.

In sum, the Defendant alleges that KDK did not provide proper notice to either it or the Project Owner pursuant to Article 4.1 of the Bond in issue. See e.g., Defendant's Opposition at p. 4, 10. However, KDK did in fact deliver such notice to both Travelers and the project owner, MHFA, by certified mail, return receipt requested, on January 21, 2006. Exhibit A attached hereto. Said notice included both KDK's October 28, 2004 letter as well as its January 13, 2005 letter, speaks for itself and clearly satisfies Article 4.1 of the Bond. Id.

WHEREFORE, for the reasons set forth above and in the other pleadings previously filed, the Plaintiff, KDK Enterprises, Inc. asks that this Honorable Court enter summary judgment on Court I of the Complaint and grant judgment against the Defendant, in the amount of $612,230.00 plus interest at the statutory rate from the date of breach, February 27, 2005.

KDK ENTERPRISES, INC.
By its Attorneys,

Date: ____9-25-06_____

/s/ James G. Grillo_____
Patrick J. Sullivan, Esq., BBO# 548752
James G. Grillo, Esq., BBO# 638730
Heafitz & Sullivan
56 Chestnut Hill Avenue
Boston, MA 02135
(617) 562-1000

**HEAFITZ & SULLIVAN, LLP**
ATTORNEYS AT LAW
56 CHESTNUT HILL AVENUE
BOSTON, MASSACHUSETTS 02135
(617) 562-1000
FAX (617) 562-0069
www.hsconstructionlaw.com

HARVEY B. HEAFITZ
PATRICK J. SULLIVAN

JAMES G. GRILLO

(OF COUNSEL)
PETER B. WOLK

January 21, 2005

Travelers Casualty and Surety Co. of America          Massachusetts Housing Finance Agency
300 Crown Colony Drive                                One Beacon Street
Quincy, MA 02169                                      Boston, MA 02108
*Certified Mail No. 7003 1680 0006 8667 4949*          *Certified Mail No. 7003 1680 0006 8667 4956*


**Re:    KDK Enterprises, Inc.**
**vs.    Peabody Construction Co., Inc. (Academy Homes)**
**Our File No. 5995/1124**

To whom it may concern:

Kindly accept the following and the enclosures attached herewith as notice of the bond claim of
KDK Enterprises, Inc. of Waltham, Massachusetts with respect to work performed on MFHA
Project No. 96-006 – Academy Homes II, Boston Massachusetts.

I trust the attached material is self-explanatory, but would invite you to contact the undersigned
with any questions that you may have.

Thank you for your time.

Very truly yours,

James G. Grillo

Enclosures

cc:    KDK Enterprises, Inc.
       Peabody Construction Co., Inc.

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Massachusetts Housing Finance
Agency
One Beacon Street
Boston, MA 02108

PS Form 3811, August 2001     Domestic Return Receipt

COMPLETE THIS SECTION ON DELIVERY

A. Signature

X _____  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☑ Certified Mail     ☐ Express Mail
   ☐ Registered         ☐ Return Receipt for Merchandise
   ☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)     ☐ Yes

Article Number
(Transfer from service label)     7003 1680 0006 8667 4956

102595-02-M-1540

---

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Travelers Casualty and
Surety Co. of America
300 Crown Colony Drive
Quincy, MA 02169

2. Article Number
(Transfer from service label)     7003 1680 0006 8667 4949

PS Form 3811, August 2001     Domestic Return Receipt

COMPLETE THIS SECTION ON DELIVERY

A. Signature

X _____  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☑ Certified Mail     ☐ Express Mail
   ☐ Registered         ☐ Return Receipt for Merchandise
   ☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)     ☐ Yes

102595-02-M-1540

---



7003 1680 0006 8667 4949

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

Postage  $

Certified Fee

Return Receipt Fee
(Endorsement Required)

Restricted Delivery Fee
(Endorsement Required)

Postmark
Here

Total Postage & Fees  $

Sent To
Travelers Casualty and
Surety Co. of America
Street, Apt. No.;
or PO Box No.  300 Crown Colony Drive
City, State, ZIP+4  Quincy, MA 02169

PS Form 3800, June 2002     See Reverse for Instructions

---



7003 1680 0006 8667 4956

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

Postage  $

Certified Fee

Return Receipt Fee
(Endorsement Required)

Restricted Delivery Fee
(Endorsement Required)

Postmark
Here

Total Postage & Fees  $

Sent To
Massachusetts Housing Finance
Agency
Street, Apt. No.;
or PO Box No.  One Beacon Street
City, State, ZIP+4  Boston, MA 02108

PS Form 3800, June 2002     See Reverse for Instructions



UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Heafitz & Sullivan
56 Chestnut Hill Avenue
Boston, MA 02135

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Heafitz & Sullivan
56 Chestnut Hill Avenue
Boston, MA 02135

**Certified Mail Provides:**

(see reverse) PS Form 3800, June 2002

■ A mailing receipt
■ A unique identifier for your mailpiece
■ A record of delivery kept by the Postal Service for two years

*Important Reminders:*
■ Certified Mail may ONLY be combined with First-Class Mail or Priority Mail.
■ Certified Mail is *not* available for any class of international mail.
■ NO INSURANCE COVERAGE IS PROVIDED with Certified Mail. For valuables, please consider Insured or Registered Mail.
■ For an additional fee, a *Return Receipt* may be requested to provide proof of delivery. To obtain Return Receipt service, please complete and attach a Return Receipt (PS Form 3811) to the article and add applicable postage to cover the fee. Endorse mailpiece "Return Receipt Requested". To receive a fee waiver for a duplicate return receipt, a USPS® postmark on your Certified Mail receipt is required.
■ For an additional fee, delivery may be restricted to the addressee or addressee's authorized agent. Advise the clerk or mark the mailpiece with the endorsement *"Restricted Delivery"*.
■ If a postmark on the Certified Mail receipt is desired, please present the article at the post office for postmarking. If a postmark on the Certified Mail receipt is not needed, detach and affix label with postage and mail.

**IMPORTANT: Save this receipt and present it when making an inquiry.**
**Internet access to delivery information is not available on mail**
**addressed to APOs and FPOs.**

**Certified Mail Provides:**

(see reverse) PS Form 3800, June 2002

■ A mailing receipt
■ A unique identifier for your mailpiece
■ A record of delivery kept by the Postal Service for two years

*Important Reminders:*
■ Certified Mail may ONLY be combined with First-Class Mail or Priority Mail.
■ Certified Mail is *not* available for any class of international mail.
■ NO INSURANCE COVERAGE IS PROVIDED with Certified Mail. For valuables, please consider Insured or Registered Mail.
■ For an additional fee, a *Return Receipt* may be requested to provide proof of delivery. To obtain Return Receipt service, please complete and attach a Return Receipt (PS Form 3811) to the article and add applicable postage to cover the fee. Endorse mailpiece "Return Receipt Requested". To receive a fee waiver for a duplicate return receipt, a USPS® postmark on your Certified Mail receipt is required.
■ For an additional fee, delivery may be restricted to the addressee or addressee's authorized agent. Advise the clerk or mark the mailpiece with the endorsement *"Restricted Delivery"*.
■ If a postmark on the Certified Mail receipt is desired, please present the article at the post office for postmarking. If a postmark on the Certified Mail receipt is not needed, detach and affix label with postage and mail.

**IMPORTANT: Save this receipt and present it when making an inquiry.**
**Internet access to delivery information is not available on mail**
**addressed to APOs and FPOs.**

**HEAFITZ & SULLIVAN, LLP**
ATTORNEYS AT LAW
56 CHESTNUT HILL AVENUE
BOSTON, MASSACHUSETTS 02135
(617) 562-1000
FAX (617) 562-0069
www.hsconstructionlaw.com

HARVEY B. HEAFITZ
PATRICK J. SULLIVAN

JAMES G. GRILLO

(OF COUNSEL)
PETER B. WOLK

January 13, 2005

*Via UPS Delivery*

Ms. Laurie Larson
Travelers
One Tower Square - Bond
14CZ
Hartford, CT 06183

Re:   **KDK Enterprises, Inc.**
vs.   **Peabody Construction Co., Inc. (Academy Homes)**
      **Our File No. 5995/1124**

Dear Ms. Larson,

Kindly consider this letter in follow up to our letter of October 28, 2004 (additional copy enclosed). I presume that by now you have had more than ample time to review the matters as set forth in the referenced letter in complete detail as required by mandate of G.L. c. 176D and note that we have yet to receive benefit of any follow up from your end in regard to same. See also John W. Egan Co., Inc. v. Major Const. Management Corp., 46 Mass.App.Ct. 643, 645-646 (1999) ("it is up to the (compensated) surety to keep itself informed of any defaults on the part of the principal; it is not the task of the creditor to inform and give notice to the surety"). At this juncture we request you kindly forward a monetized statement of any incomplete or unsatisfactory work items pertinent to the subject project and arrange for disbursement of any remaining contract balance payable to KDK in excess of the fair and reasonable value of any legitimate painting items as may appear on such list. In the event that the impasse in payment and request for information is not resolved forthwith we will proceed to place the matter into suit as per prior demand and notice depositions and/or proceed to summary judgment as appropriate.

Please advise.

Very truly yours,

Patrick J. Sullivan

PJS/gt
Enclosures
cc:   KDK Enterprises, Inc.

HEAFITZ & SULLIVAN, LLP
ATTORNEYS AT LAW
56 CHESTNUT HILL AVENUE
BOSTON, MASSACHUSETTS 02135
(617) 562-1000
FAX (617) 562-0069
www.hsconstructionlaw.com

HARVEY B. HEAFITZ
PATRICK J. SULLIVAN

(OF COUNSEL)
PETER B. WOLK

JAMES G. GRILLO

October 28, 2004

*Via UPS Delivery*

Mr. Edward Sople
Peabody Construction Co., Inc.
536 Granite Street
Braintree, MA 02184

**Re:    KDK Enterprises, Inc.**
**vs.    Peabody Construction Co., Inc. (Academy Homes)**
**Our File No. 5995/1124**

Dear Mr. Sople,

Please be advised that this office is counsel to KDK Enterprises, Inc. in regard to the referenced Project. Kindly accept this letter in furtherance of KDK's recent correspondence seeking to resolve various outstanding issues on the Project. While we believe that these issues have been covered in depth in past communications, we will endeavor to provide a brief overview of each at this time.

1. OCIP:    As you are aware, KDK is seeking both reimbursement of the $43,080.00 withheld from it during the course of the project as well as $85,106.25 in related expenses which it was forced to absorb when the Project owner declined to continue utilizing OCIP in May of 2003.

KDK contracted to perform work on this Project at a time when Peabody was well into the performance and after the owner had elected to utilize OCIP. KDK's original proposal for the work was for $908,000.00 Exhibit A. However, Mr. Calhoun of Peabody Construction informed KDK that since the owner had opted to utilize OCIP, KDK would not be required to maintain insurance on the Project. Mr. Calhoun went on to insist that KDK lower its price by removing the associated costs related to insurance. KDK complied with Mr. Calhoun's request to not carry insurance based upon his representations and the parties entered into a painting contract for 782,000.00. Exhibit B. Thereafter, Peabody attempted to backcharge KDK $43,080.00 for OCIP coverage, even though Mr. Calhoun had represented that the owner was covering these costs (and thus KDK should not include same in its contract price).

Similarly, as KDK did not carry the insurance costs in its contract at Mr. Calhoun's request, KDK was forced to pay directly out of pocket to cover KDK's insurance costs when the owner opted out of OCIP. Exhibit C. Per Peabody's instructions, KDK submitted change orders for the

HEAFITZ & SULLIVAN, LLP

Mr. Edward Sopie
October 28, 2004
Page Two

additional costs associated with the insurance, which Peabody then refused to honor.  Exhibit D.
Under these circumstances, whether a mistake on the part of Peabody or perhaps something
more, it is unfair to expect KDK to bear these costs where Peabody received the benefit of
KDK's greatly reduced price based on Mr. Calhoun's representations.  See First Safety Fund
National Bank v. Janet M. Friel, 23 Mass.App.Ct. 583, 504 N.E. 2d 664 (1997) and authority
cited therein (a party may avoid a contract on the basis of mistake if the effect of the mistake is
such that enforcement of the contract would be unconscionable or the other party had reason to
know of the mistake or his fault caused the mistake).  Further. to the extent that Mr. Calhoun's
conduct was intentionally designed to mislead KDK, then it is well settled that a contract
procured by fraud is similarly unenforceable.  See e.g. Hashem v. Massachusetts Security Corp..
255 Mass. 29, 31 (1926) ("Fraud vitiates every transaction at the election of the injured party").

2.  Cleaning Backcharges.  Peabody is apparently attempting to foist responsibility on KDK for
some $75,650.00 in alleged cleaning on the Project.  First, cleaning is not part of KDK's work
under the Project specifications.  See Exhibit E.  In fact, cleaning and final cleaning are
expressly detailed under "Section 01040 – Project Coordination", which is obviously part of
Peabody's responsibility on the Project.  Exhibit F.  We would also note, for instance, that the
SOS charges of $26,000.00 for so-called "re-cleaning", are really for the final cleaning, which is
Peabody's responsibility.  Compare Exhibit G and Exhibit F.

While I understand that KDK may have agreed to share the costs associated with the clean up of
KDK's lunch related trash (which only amounts to minutes a day), I do not believe that Peabody
is being realistic in attempting to turn KDK's good faith willingness to share costs associated
with the clean up of KDK's lunch related trash into a requirement that KDK pay for tens of
thousands of dollars in labor costs which the contract clearly allocates to Peabody.  If Peabody
has confirmation that KDK agreed to accept some $75,000.00 in backcharges, then it is
requested that same be provided.  Otherwise, KDK submits that Peabody should retract these
charges forthwith.

3.  Change Orders.  Attached hereto as Exhibit H is a breakdown of KDK's change orders on the
Project.  In sum, KDK is seeking $77,928.00 (see column 7) for change orders which encompass
approved work but which Peabody has yet to process.  In addition, KDK also seeks $170,068.59
in extra work (see column 8) which Peabody directed but is refusing to now acknowledge (which
sum includes the $85,106.25 for the discontinuance of the OCIP as referred to above).  As there
has already been extensive documentation between KDK and Peabody on these matters, I will
not reiterate the full history herein.

4.  Level 4/Level 5.  As you are aware, the Drywall specifications expressly called for a Level 4
wall finish (Exhibit I) and when KDK substantially completed its painting work, that is what was
provided.  However, in generating the Punch List, it appears that the architect on the Project
decided after seeing the painting work, that a Level 5 finish would be more appropriate and as a

HEAFITZ & SULLIVAN, LLP

Mr. Edward Sopie
October 28, 2004
Page Three

result, Peabody directed the Drywall subcontractor to perform certain patching. To make matters worse, I am informed that Peabody was forced to replace the Drywall subcontractor on two separate occasions during the course of the Project and the third of such subcontractors appears to have gone outside the Punch List and performed patching far in excess of what even the architect called for. KDK further noted that it did not appear that the newest Drywall subcontractor was proceeding with a supervisor or foreman. KDK brought these issues to Peabody's attention, which Peabody substantially disregarded. E.g. Exhibit J. KDK was forced to expend significant additional man-hours repainting large sections the project. Further, Peabody's Drywall contractor, specifically in Building A13, is still performing unnecessary patches which are beyond the punch list and which will create additional extra work for KDK. As the work is still ongoing, KDK is in the process of compiling the records reflecting the extra time and charges incurred and will provide same to Peabody in due course.

On a related note, we are informed that KDK is continuing to perform its work in good faith to achieve completion in accordance with the recent understanding reached with Mr. Ted Fish of Peabody Construction. However, Peabody has failed and refused to make the payment which was promised on Friday, October 22, 2004.

That said, KDK is interested in working towards a mutually agreeable resolution at this time. Therefore, it is requested that Peabody make arrangements to meet with representatives of KDK within the next five (5) days to discuss these matters more fully (as represented in Peabody's correspondence of October 21, 2004). If Peabody believes that it requires some specific additional material in advance of such meeting, KDK will endeavor to provide same. However, to the extent such material has previously been provided, then Peabody is directed to its own files for the correspondence and materials which the parties have exchanged over the last several years.

Also, I would note that while Peabody appears to be taking the position that KDK is not in compliance with the claim procedures of the Contract Documents, Peabody has never articulated a specific requirement which KDK has failed to meet. In this regard, we would note that the form of subcontract utilized by Peabody for this Project does not specifically bind KDK to Peabody in a like manner and extent as Peabody is bound to the owner. See Exhibit B. In addition, it is well settled that contract clauses which on their face only apply to the general contractor will not be imputed to a subcontractor. In any event, if you continue to maintain that KDK's claims are not in compliance with the Contract Documents, then we would ask that you identify in writing those provisions which you believe support your contention. If Peabody does not timely identify such provisions, we will assume that the issue is moot and any alleged issue is waived.

HEAFITZ & SULLIVAN, LLP

Mr. Edward Sopie
October 28, 2004
Page Four

In the event that this matter is not attended to we will proceed with civil process and include counts pursuant to G.L. c. 149, §29 as well as G.L. c. 93A, §11 against Peabody as well as its surety. As you are aware, said statutes provide for treble damages, legal fees and court costs (*inter alia*).

On behalf of KDK Enterprises, Inc., all rights, remedies, benefits and protections as may be available pursuant to the laws of the Commonwealth of Massachusetts are hereby reserved in entirety.

Very truly yours,

Patrick L. Sullivan

Enclosures

cc: Travelers Casualty and Surety Company of America: Atten. Surety Bonds Claim Manager
     Mr. Ted Fish
     Havery B. Heafitz
     James G. Grillo
     KDK Enterprises, Inc.

*Exhibit A*

# KDK Enterprises, Inc.

145 Newton Street Waltham, MA 02453 - Tel (781) 647-4411 Fax (781) 647-0888

| To: | Peabody Construction Company | | Date: 12/07/01 |
|---|---|---|---|
| | 536 Granite Street | | |
| | Braintree, MA | Job Name: | Academy Homes II |
| | | Job Location: | Roxbury, MA |

**Attention: David Calhoun**

Proposal for the following scope of work

Provide all labor and material to furnish and install all Painting as per Specifications
Section 09900 and as shown on drawings included in volume 1, 2, 3

KDK Enterprises to furnish material and labor to complete in accordance with the above scope of work.
for the sum of:

| Nine Hundred & Eight thousand dollars | TOTAL: $ | 908,000.00 |
|---|---|---|

Any alteration or deviation from above specifications involving
extra costs will be executed only upon written order, and will
become an extra charge over and above the estimate.

Authorized
Signature_____

**Acceptance of Contract** - The above prices,
specification and conditions are satisfactory and are hereby
accepted. Your are authorized to do the work as specified.

Signature_____

Date of Acceptance:_____

Signature_____

# ODF.HOON.PEABODY

## A MINORITY CONSTRUCTION JOINT VENTURE

1960-1964 WASHINGTON STREET, BOSTON, MA 02118

December 7, 2001

KDK Enterprises
145 Newton Street
Waltham, MA 02453
Phone: 781.647.4411
Fax:   781.647.0888

> Re:   **Academy Homes II**
>       **Painting**

Dear Boris:

Confirming our agreement of December 7, 2001 ODF.Hoon.Peabody, Joint Venture will be forwarding their standard form of agreement to KDK Enterprises to further memorialize our agreement of this date. The scope of work and contract amount are as follows:

*Provide all Union labor, materials, staging, lifts and hoisting to furnish and install all Interior and Exterior Painting (Section 09900) complete in accordance with plans and specifications dated 3/23/00, addenda 1 to 3 and alternates 3, 6, 9, 16, 17, 18, 19, 20 and 22. The following clarifications to the contract documents are included:*

> · *KDK has incorporated all prep work on the exterior and interior nail holes as well as all finish painting at the exterior including and not necessarily limited to all areas receiving "hardy plank" and any/all other exterior finishes. The contract documents call for an aluminum clad trim. However, this has been amended to pre-primed trim which will be furnished and installed by the Rough Carpenter but will be finish painted under this contract at no additional cost. All costs of painting the exterior trim are included in this lump sum.*

The total lump sum contract amount including a 100% payment and performance bond is $782,000.00.

KDK Enterprises recognizes that all sites must be manned simultaneously with ample crews to meet ODF.Hoon.Peabody's project schedule.

All coordination issues will be expedited immediately with the Project Management team. Shop drawings and submittals will be received by ODF.Hoon.Peabody within 2-3 weeks. All materials will be readily available to commence work when required.

Dec-10-01 09:32A ALDOR/KDK                         781 647 0888         P.03
DEC-07-01 FRI 05:13 PM   PEABODY CONSTRUCTION        FAX NO. 781 543 1558

The Owner has selected an Owner Controlled Insurance Program and all contractors will be required to participate in said program.

It is understood that KDK will be the sole painter on this project and thus has reviewed all contract documents and has incorporated any/all painting required to make the Academy Homes II project complete in its entirety.

KDK Enterprises has read and understands the requirements of the General Conditions including all phasing requirements, insurance, local hiring requirements, etc. and has incorporated the same into their contract amount.

Please execute a copy of this letter and forward on to my attention at 781.843.1543 within 24 hours accompanied by a letter from your Surety stating that they will be providing a 100% payment and performance bond for the project. ODF.Hoon.Peabody's bond forms are attached and are a requirement for all bonds. Upon receipt of a signed letter, a formal contract will be forwarded. It is also understood that no payment can be issued to this subcontractor unless a signed Letter of Intent, signed contract, payment and performance bond and insurance is received by this office. Thanking you in advance for giving this your immediate attention and we look forward to a successful project for all.

Sincerely,

PEABODY CONSTRUCTION CO., INC.

David Calhoun
Vice President of Purchasing

Agreed and accepted by

(It is agreed and understood that all submittals and contractual obligations commence on the date of this agreement.)

ODF. HOON. PEABODY
E. O'Connell
A MINORITY CONSTRUCTION JOINT VENTURE
1060-1064 Washington Street • Boston, MA 02118
Voice 617.541.1702 • Facsimile: 617.541.1706



RECEIVED

JAN 0 4 2002

PEABODYCONS.CO..INC.

S C H E D U L E    O N E
-------------------------
ATTACHED TO AND FORMING PART OF AN AGREEMENT
BETWEEN CONTRACTOR AND SUBCONTRACTOR

1.   DATE OF THIS AGREEMENT:        DECEMBER 7, 2001

2.   NAME OF SUBCONTRACTOR:         KDK ENTERPRISES

3.   ADDRESS:                       145 NEWTON STREET
                                    WALTHAM, MA 02453
                                    PHONE: 781.647.4411
                                    FAX:   781.647.0886

4.   OWNER:                         MASSACHUSETTS HOUSING FINANCE
                                    AGENCY
                                    ONE BEACON STREET
                                    BOSTON MA 02108

5.   ARCHITECT:                     CHIA-MING SZE ARCHITECT, INC. AND
                                    ELTON & ASSOCIATES
                                    A JOINT VENTURE WAY
                                    326 A STREET
                                    BOSTON MA 02210

6.   PROJECT AND LOCATION:          ACADEMY HOMES II
                                    ROXBURY MA

7.   GENERAL CONTRACT DATE:         TO FOLLOW

8.   DESCRIPTION OF THE WORK:  THIS SUBCONTRACTOR SHALL PROVIDE ALL
     NECESSARY LABOR, MATERIALS, STAGING, LIFTS AND HOISTING TO
     FURNISH AND INSTALL ALL INTERIOR AND EXTERIOR PAINTING (SECTION
     09900) AS PER THE AGREED LETTER OF INTENT DATED 12/7/01 ATTACHED
     TO THIS CONTRACT AS EXHIBIT "J" AND ALL WORK IN ACCORDANCE WITH
     THE CONTRACT DOCUMENTS AS DESCRIBED IN EXHIBIT "A", IN ITS
     ENTIRETY WITH THE ADDITIONS AND/OR EXCLUSIONS INDICATED IN RIDER
     TO SECTION 3 INCLUDING ADDENDA 1 TO 3.

9.   TOTAL PRICE:    $782,000 (Includes bond premium)
                     SEVEN HUNDRED EIGHTY TWO THOUSAND DOLLARS

INITIAL OF SUBCONTRACTOR _B.K._         CONTRACTOR _____

PAGE 1 OF 4

# ODF.HOON.PEABODY

A MINORITY CONSTRUCTION JOINT VENTURE

1960-1964 Washington Street • Boston, MA 02118
617 541 1702 • Facsimile: 617 541 1706

10.  PAYMENT TERMS:

    MONTHLY PAYMENTS AS THE WORK PROGRESSES LESS TEN (10)
    PERCENT. FINAL PAYMENT (RETAINAGE) 65 DAYS AFTER
    COMPLETION AND ACCEPTANCE OF THIS CONTRACTORS WORK.

11.  LIST OF RIDERS AND ATTACHMENTS:

        SEE RIDERS TO SECTIONS 2, 3, 4, 7, 10, 11 & 12
        EXHIBIT "A" LIST OF CONTRACT DOCUMENTS
        EXHIBIT "B" SUBCONTRACTOR'S APPLICATION FOR PAYMENT
        EXHIBIT "C" CONVEYANCE OF PERSONAL PROPERTY
        EXHIBIT "D" PAYMENT BOND
        EXHIBIT "E" PERFORMANCE BOND
        EXHIBIT "F" CORPORATE AUTHORIZATION
        EXHIBIT "G" EEO REQUIREMENTS / GENERAL WAGE DECISION
        EXHIBIT "H" INSURANCE AND BONDING REQUIREMENTS
        EXHIBIT "I" SUBCONTRACTOR SAFETY & HEALTH RESPONSIBILITY
        EXHIBIT "J" LETTER OF INTENT DATED 12/7/01
        EXHIBIT "K" HOURLY COST FOR CHANGE WORK

RIDER TO SECTION 2:  ADDENDA 1 THROUGH 3

RIDERS TO SECTION 3:

 INCLUDES:

 See Letter of Intent dated 12/7/01 for additional "Includes".

 Unloading, distribution, hoisting, scaffolding, planking, and
 installation of all materials, equipment, and supplies.

 Field measurement as required to insure proper fit and/or interface
 with existing conditions and/or materials provided by others.

 Fabrication of materials and erection to be in accordance with
 approved shop drawings.

 All materials and installations shall be in full compliance with
 all governing codes including but not limited to local and state
 building codes.

 The timing of all deliveries of materials to the jobsite, and the
 location where materials are placed upon their arrival at the
 jobsite, shall be scheduled (48 HOUR NOTICE REQUIRED) and
 coordinated with the Project Superintendent and shall be scheduled
 and located in accordance with his directions.

INITIAL OF SUBCONTRACTOR _B.K_          CONTRACTOR _____

PAGE 2 OF 4

ODE.HOON.PEABODY

A MINORITY CONSTRUCTION JOINT VENTURE

1960-1964 Washington Street • Boston, MA  02118

Work shall progress concurrently at all buildings unless otherwise scheduled or required.

All MHFA requirements must be met or exceeded by all subcontractors to the fullest extent required by the contract documents.

The Subcontractor will be required to participate in the Owner Controlled Insurance Program (OCIP) should the Owner choose to implement the program. (See specifications.)

Parking and onsite storage must be pre-approved by Peabody Construction's Field Staff.

RIDER TO SECTION 4:

Excludes sales tax. TAX EXEMPT NO. TO FOLLOW.

Prices are firm and not subject to escalation through project completion.

RIDER TO SECTION 7:

Cost of permits, fees, charges, bonds, etc., as required by municipalities, public agencies, and/or utility companies.

RIDER TO SECTION 10:

Performance and payment bonds in the full amount of the contract on the forms provided. The bond premium costs are included in the contract amounts.

RIDER TO SECTION 11:

ALL SHOP DRAWINGS ( 1 SEPIA AND 6 BLACKLINE PRINTS ), BROCHURES, AND CATALOG CUTS ( 7 EACH ), SAMPLES ( 3 EACH ), AND CERTIFICATES OF COMPLIANCE AS REQUIRED BY THE CONTRACT DOCUMENTS OR AS NECESSARY TO PROPERLY COORDINATE THE WORK, MUST BE SUBMITTED WITHIN 10 DAYS OF THE DATE OF THIS CONTRACT. ALL SUBMITTALS MUST CLEARLY INDICATE AND DESCRIBE ANY DEVIATION FROM THE PLANS AND/OR SPECIFICATIONS .

Record drawings in full compliance with the contract documents shall be made available at all times for review by the architect, owner, and/or contractor. Record drawings will be reviewed each month prior to submittal of requisition for payment. Progress payments will not be released if record drawings are not current.

INITIAL OF SUBCONTRACTOR *B.K.*          CONTRACTOR

PAGE 3 OF 4

ODF.HOON.PEABODY

A MINORITY CONSTRUCTION JOINT VENTURE

1960-1964 Washington Street • Boston, MA 02118
Voice: 617.541.1702 • Facsimile: 617.541.1706

RIDER TO SECTION 12:

Removal and disposal of all debris, including packaging. etc. from the premises into dumpsters and/or containers provided by others. Clean up shall be on a regular schedule to insure that debris will not be allowed to accumulate on the premises.  Upon completion of work the area(s) shall be left ready for final cleaning.


SUBCONTRACTOR
KDK ENTERPRISES

President

CONTRACTOR
ODF.HOON.PEABODY  A JOINT VENTURE

Edward A. Fish, Jr.
Treasurer

INITIAL OF SUBCONTRACTOR   *B.K.*          CONTRACTOR

PAGE 4 OF 4

## ODF.HOON.PEABODY

A MINORITY CONSTRUCTION JOINT VENTURE

1960-1964 Washington Street • Boston. MA  02118
617.541.1702 • Facsimile: 617.541.1706

OCT-27-2004 14:33 FROM:
05-09-2003 09:40am From-

TO:    7562000e
        T-001

Exhibit C

Patrick F. Richards

Marsh USA Inc.
200 Clarendon Street
Boston, MA 02116-5093
617 421 1200 Fax 617 421 5699
tien.f.richards@marsh.com
www.marsh.com

# MARSH

May 07, 2003

KDK Enterprises
145 Newton St
Waltham, MA 02453
781-647-0888

RE:    Notice of Discontinuance of Owner Controlled Insurance Program
       Academy Homes

Dear Contractor:

We have notified the General Contractor that pursuant to Section 2.9 of the Special Conditions
For Owner Controlled Insurance Program (the "Special Conditions") under the construction
contract for the above referenced development, the Massachusetts Housing Finance Agency, as
Interim Asset Manager for the U.S. Department of Housing and Urban Development (the
"Owner") has elected not to continue to furnish insurance defined under Section 2.1.1 (Workers'
Compensation Insurance) and Section 2.1.2 (Liability Insurance (Excluding Automobile and
Professional Liability But Including Excess Employers Liability)) as of 12:01 AM June 7, 2003.
The Owner will, however, continue to provide coverage under Section 2.1.3 (All Risk Builder's
Risk including Transit) of the Special Conditions.

You will receive a legal notice of policy cancellation directly from The Kemper Insurance
Companies under separate cover.

Please submit all payroll reports to Marsh/West for work through June 6, 2003, and notify your
workers compensation, general liability and umbrella liability carriers that any work after that
date will be covered under your own workers compensation, general liability and umbrella
liability policies.

You should also be aware that a final payroll audit will be completed by a representative of The
Kemper Insurance Companies as part of the OCIP closeout. This audit will be conducted based
on the certified payrolls submitted by contractors of all tiers to the General Contractor on each
project. Therefore, all certified payroll should be completed and submitted to your General
Contractor immediately.

MMC  Marsh & McLennan Companies

OCT-27-2004 14:33  FROM:
05-03-2003  09:40am  From-                                    TO:    7562006S          P.2/9
                                                                    T-001  P.002/002  F-139

# MARSH

Page 2
May 07, 2003

In addition, please submit a certificate of insurance to Marsh/West ind cating workers
compensation, general liability and umbrella liability coverages for you r work on the Theroch I
project after June 6, 2003. The certificate must comply with the Conn actor Insurance
Requirements included as Exhibit A to the General Conditions of the construction contract.

Should you have any questions relative to this correspondence, please contact Trish Richards at
Marsh at (617) 421 0540.

Sincerely,

Patricia F. Richards
Wrap-Up Manager

Exhibit D

# KDK Enterprises, Inc.

145 Newton Street Waltham, MA 02453 - Tel: (781) 647-4411- Fax: (781) 647-0888

August 18, 2004

Peabody Construction Co., Inc.
536 Granite Street
Braintree, MA 02184
Attention: Ed Sople

RE:   Academy Homes II
      C.O. #82: OCIP

KDK is submitting Change Order# 82 for reimbursement for the cost of Workman
Compensation and Liability Insurance, which was not reimbursed by the OCIP Program
according to Contract documentation.

Per our conversation, my understanding is there will not be any hesitation on your part or the
Owner's part to release payment for the cost of the Insurance against the Contract Labor hours
from the Contract obligations from the period of June 2003 throughout the completion of the
above referenced project.

We calculated this on the base of the cost of insurance and man-hours spent against the original
Contract work.

Per the attached extra work (C.O.'s) summary for that period of time, submitted by KDK
represents a total of $96,316.26.

| | |
|---|---|
| Total Cost of Payroll Labor: | $411,524.57 |
| Less Extra Work: | -$96,316.26 |
| Total Reimbursement for the OCIP Insurance: | $315,208.31 |
| Workman Comp. & Liability represents 27%: | |

**TOTAL OF C.O. #82:**     **$85,106.25**

Sincerely.

Alex Dorjets
Vice President

C.O.#82

# KDK Enterprises, Inc.

145 Newton Street Waltham, MA 02453 - Tel: (781) 647-4411- Fax: (781) 647-0888

June 3, 2003

Peabody Construction Co., Inc.
35 Court Street
Medford, MA 02155
Attention: Neil Davis

RE:   OCIP Insurance Program
      Academy Homes II

Dear Neil,

Per our June 3, 2003 telephone discussion regarding reimbursement of insurance due to the cancellation of OCIP program on June 6, 2003. KDK was directed to submit change orders on a monthly basis for the remainder of the project.

Any questions please contact our office.

Sincerely,

Gil Kalesinskas
Insurance Officer
SENT BY FAX TO SITE

Cc. Ed Sople, PCCI
    SENT BY FAX AND MAILTO MAIN OFFICE

SECTION 09900 - PAINTING                                              Exhibit E

PART 1 - GENERAL

1.1    RELATED DOCUMENTS

   A.  Drawings and general provisions of the Contract, including
       General and Supplementary Conditions and Division 1
       Specification Sections, apply to this Section.

1.2    SUMMARY

   A.  This Section includes surface preparation, painting, and
       finishing of exposed interior and exterior items and
       surfaces.

       1.  Surface preparation, priming, and finish coats
           specified in this Section are in addition to shop-
           priming and surface treatment specified under other
           Sections.

       2.  Work of this Section includes the following:
           a.  Priming of exterior trim prior to installation
               this includes all wood trim scheduled to have
               aluminum clading
           b.  Painting of cement based siding
           c.  All doors and casings
           d.  all gypsum wallboard surfaces, ceilings and
               partitions in basements to have fungicide included
               in its contents.
           e.  Painting of all rails at stairs and ramps
           f.  Painting of new galvanized steel fence
           g.  Painting of soffits



       Paint exposed surfaces whether or not colors are designated
       in schedules, except where a surface or material is
       specifically indicated not to be painted or is to remain
       natural.  Where an item or surface is not specifically
       mentioned, paint the same as similar adjacent materials or
       surfaces.  If color or finish is not designated, the
       Architect will select from standard colors or finishes
       available.

       1.  Interior color schemes to include five (5) basic wall
           covers and five (5) trim colors.
       2.  Painting includes field-painting exposed bare and
           covered pipes and ducts (including color coding),
           hangers, exposed steel and iron work, and primed metal
           surfaces of mechanical and electrical equipment.

   C.  Painting is not required on prefinished items, finished
       metal surfaces, concealed surfaces, operating parts, and
       labels.

A.  General:  Submit the following according to Conditions of the Contract and Division 1 Specification Sections.

B.  Product data for each paint system specified, including block fillers and primers.

   1.  Provide the manufacturer's technical information including label analysis and instructions for handling, storage, and application of each material proposed for use.
   2.  List each material and cross-reference the specific coating, finish system, and application.  Identify each material by the manufacturer's catalog number and general classification.
   3.  Certification by the manufacturer that products supplied comply with local regulations controlling use of volatile organic compounds (VOCs).

C.  Samples for initial color selection in the form of manufacturer's color charts.

   1.  After color selection, the Architect will furnish color chips for surfaces to be coated.

D.  Samples for Verification Purposes:  Provide samples of each color and material to be applied, with texture to simulate actual conditions, on representative samples of the actual substrate.

   1.  Provide stepped samples, defining each separate coat, including primers.  Use representative colors when preparing samples for review.  Resubmit until required sheen, color, and texture are achieved.
   2.  Provide a list of material and application for each coat of each sample.  Label each sample as to location and application.
   3.  Submit samples on the following substrates for the Architect's review of color and texture only:

      a.  Painted Wood:  Provide two 12-inch-square samples of each color and material on hardboard.
      b.  Ferrous Metal:  Provide two 4-inch-square samples of flat metal and two 8-inch-long samples of solid metal for each color and finish.

1.4   QUALITY ASSURANCE

A.  Applicator Qualifications:  Engage an experienced applicator who has completed painting system applications similar in material and extent to those indicated for the Project that have resulted in a construction record of successful in-service performance.

A.  Apply water-based paints only when the temperature of surfaces to be painted and surrounding air temperatures are between 50 deg F (10 deg C) and 90 deg F (32 deg C).

B.  Apply solvent-thinned paints only when the temperature of surfaces to be painted and surrounding air temperatures are between 45 deg F (7 deg C) and 95 deg F (35 deg C).

C.  Do not apply paint in snow, rain, fog, or mist; or when the relative humidity exceeds 85 percent; or at temperatures less than 5 deg F (3 deg C) above the dew point; or to damp or wet surfaces.

    1.  Painting may continue during inclement weather if surfaces and areas to be painted are enclosed and heated within temperature limits specified by the manufacturer during application and drying periods.

PART 2 - PRODUCTS

2.1   MANUFACTURERS

A.  Available Manufacturers:   Subject to compliance with requirements, manufacturers offering products that may be incorporated in the Work include, but are not limited to, the following:

    1.  Benjamin Moore and Co. (Moore).
    2.  Pratt and Lambert (P & L).
    3.  The Sherwin-Williams Company (S-W).

2.2   PAINT MATERIALS, GENERAL

A.  Material Compatibility:   Provide block fillers, primers, finish coat materials, and related materials that are compatible with one another and the substrates indicated under conditions of service and application, as demonstrated by the manufacturer based on testing and field experience.

B.  Material Quality:   Provide the manufacturer's best-quality trade sale paint material of the various coating types specified.   Paint material containers not displaying manufacturer's product identification will not be acceptable.

    1.  Proprietary Names:   Use of manufacturer's proprietary product names to designate colors or materials is not intended to imply that products named are required to be used to the exclusion of equivalent products of other manufacturers.   Furnish the manufacturer's material data and certificates of performance for proposed substitutions.

09900 - 5

C. Surface Preparation:  Clean and prepare surfaces to be painted according to the manufacturer's instructions for each particular substrate condition and as specified.

1. Provide barrier coats over incompatible primers or remove and reprime.  Notify Architect in writing about anticipated problems using the specified finish-coat material with substrates primed by others.

2. Cementitious Materials:  Prepare cementitious surfaces to be painted.  Remove efflorescence, chalk, dust, dirt, grease, oils, and release agents.  Roughen, as required, to remove glaze.  If hardeners or sealers have been used to improve curing, use mechanical methods of surface preparation.

   a. Use abrasive blast-cleaning methods if recommended by the paint manufacturer.
   b. Determine alkalinity and moisture content of surfaces by performing appropriate tests.  If surfaces are sufficiently alkaline to cause the finish paint to blister and burn, correct this condition before application.  Do not paint surfaces where moisture content exceeds that permitted in manufacturer's printed directions.

3. Wood:  Clean surfaces of dirt, oil, and other foreign substances with scrapers, mineral spirits, and sandpaper, as required.  Sand surfaces exposed to view smooth and dust off.

   a. Scrape and sand all existing wood trim to bear wood, fill all holes and depressions.
   b. Scrape and clean small, dry, seasoned knots, and apply a thin coat of white shellac or other recommended knot sealer before applying primer. After priming, fill holes and imperfections in finish surfaces with putty or plastic wood filler. Sand smooth when dried.
   c. Prime, stain, or seal wood to be painted immediately upon delivery.  Prime edges, ends, faces, undersides, and backsides of wood, including cabinets, counters, cases, and paneling.
   d. Seal tops, bottoms, and cutouts of unprimed wood doors with a heavy coat of varnish or sealer immediately upon delivery.

4. Ferrous Metals:  Clean ungalvanized ferrous metal surfaces that have not been shop-coated; remove oil, grease, dirt, loose mill scale, and other foreign substances. Use solvent or mechanical cleaning methods that comply with recommendations of the Steel Structures Painting Council (SSPC).

smooth even surface according to the manufacturer's directions.

4. Apply additional coats if undercoats, stains, or other conditions show through final coat of paint until paint film is of uniform finish, color, and appearance. Give special attention to ensure that surfaces, including edges, corners, crevices, welds, and exposed fasteners, receive a dry film thickness equivalent to that of flat surfaces.

5. The term exposed surfaces includes areas visible when permanent or built-in fixtures, convector covers, covers for finned tube radiation, grilles, and similar components are in place. Extend coatings in these areas, as required, to maintain the system integrity and provide desired protection.

6. Paint surfaces behind movable equipment and furniture the same as similar exposed surfaces. Before the final installation of equipment, paint surfaces behind permanently fixed equipment or furniture with prime coat only..

7. Paint back sides of access panels and removable or hinged covers to match exposed surfaces.

8. Finish exterior doors on tops, bottoms, and side edges same as exterior faces.

9. Sand lightly between each succeeding enamel or varnish coat.

10. Omit primer on metal surfaces that have been shop-primed and touch-up painted.

C. Scheduling Painting: Apply first coat to surfaces that have been cleaned, pretreated, or otherwise prepared for painting as soon as practicable after preparation and before subsequent surface deterioration.

1. Allow sufficient time between successive coats to permit proper drying. Do not recoat until paint has dried to where it feels firm, does not deform or feel sticky under moderate thumb pressure, and where application of another coat of paint does not cause the undercoat to lift or lose adhesion.

D. Application Procedures: Apply paints and coatings by brush, roller, spray, or other applicators according to the manufacturer's directions.

1. Brushes: Use brushes best suited for the material applied.

2. Rollers: Use rollers of carpet, velvet back, or high-pile sheep's wool as recommended by the manufacturer for the material and texture required.

3. Spray Equipment: Use airless spray equipment with orifice size as recommended by the manufacturer for the material and texture required.

by others to protect their work after completing painting operations.

1. At completion of construction activities of other trades, touch up and restore damaged or defaced painted surfaces.

3.6    ACCEPTABILITY:

(A.) Touch-ups or repairs to previously painted surfaces which result in "flashed" areas will not be acceptable and will be cause to repaint entire wall surface of area in question.

3.6    EXTERIOR PAINT SCHEDULE

A.  Wood:

1.  Gloss Alkyd Finish:  Two finish coats over primer with total dry film thickness not less than 3.5 mils.

    a.  Primer:  Exterior primer coating.
      1)  Moore:        Moorwhite Primer #100.
      2)  PPG:         1-70  or  1-870  Sun-Proof Exterior Wood Primer..
      3)  S-W:         A-100  Exterior  Alkyd  Wood Primer Y24W20.

    b.  First and Second Coats:  Gloss alkyd enamel.

      1)  Moore:        Impervo  High-Gloss  Enamel #133.
      2)  P & L:       Effecto Enamel.
      3)  S-W:         Industrial Enamel B-54 Series.

B.  Wood Trim:

1.  Medium-Shade, High-Gloss Alkyd Finish:  Two finish coats over primer.

    a.  Primer:  Exterior primer coating.
      1)  Moore:        Moorwhite Primer #100..
      2)  P & L:       Permalize Exterior Primer.
      3)  S-W:         A-100  Exterior  Alkyd  Wood Primer Y24W20.

    b.  First and Second Coats:  Medium-shade, ready-mixed exterior oil paint.
      1)  Moore:        Moore's House Paint #110.
      2)  P & L:       Effecto Enamel.
      3)  S-W:         SWP Exterior Gloss Paint A-2 Series.

C.  Wood Trim for Aluminum clading:

  2) P & L:    Effecto Enamel.
  3) S-W:    SWP Exterior Gloss Finish A-2
            Series.

F. Zinc-Coated Metal:

  1. High-Gloss Alkyd Enamel:  Two finish coats over primer.

    a. Primer:  Galvanized metal primer.
      1) Moore:   IronClad  Galvanized  Metal
             Latex Primer #155.
      2) P & L:   Interior Trim Primer.
      3) S-W:   Galvite B50W3.

    b. First and Second Coats:  Gloss alkyd enamel.
      1) Moore:   Impervo  High-Gloss  Enamel
             #133.
      2) P & L:   Effecto Enamel.
      3) S-W:   Industrial Enamel B-54 Series.

3.8 INTERIOR PAINT SCHEDULE

 A. General:  Provide the following paint systems for the
  various substrates, as indicated.

 B. Gypsum Drywall Systems:

  1. Walls: Odorless Semigloss Alkyd Enamel Finish:  Three
    coats with total dry film thickness not less than 2.5
    mils.
    for bathroom, laundry, kitchen, common stairs, basement
    gypsum surfaces.

    a 1) Moore:   Moore's Latex Quick-Dry Prime
            Seal #201.
      2) P & L:   Latex Wall Primer Z30001.
      3) S-W:   Pro-Mar 200 Latex Wall Primer
            B28W200.
      3) S-W    Wall and Wood Primer B49W2

    b. First and Second Coats:   Interior, semigloss,
      odorless, alkyd enamel
      1) Moore:   Moore's Satin Impervo Enamel #235.
      2) P & L:   Cellu-Tone Alkyd Satin Enamel.
      3) S-W:   Classic 99 Semigloss Enamel
            A40 Series.

  2. Walls: Odorless eggshell latex Finish:  Three coats
    with total dry film thickness not less than 2.5 mils.
    Eggshell finish for all areas in apartment units except
    bath and kitchen.

    a. 1). Moore   Moore's Latex Quick Dry Prime
            Seal #201.

5. Ceilings and walls in Basement area: Odorless Alkyd Semi-gloss Finish: Three coats with total dry film thickness not less than 2.5 mils.

   a. Primer: White, interior, latex-based primer.
      1) Moore:        Moore's Latex Quick-Dry Prime Seal #201.
      2) P & L:      Suprime "1".
      3) S-W:       PrepRite 200 latex wall primer

   b.✱ First and Second Coats:   Interior, semigloss, odorless, latex enamel.
   c.✱
      1) Moore:      Moore's Kitchen & Bath
      2) P & L:      Accolade Satin Enamel.
      3) S-W:       Everclean A-98

C. Woodwork:

1. Semigloss Enamel Finish: Three coats.

   a. Undercoat: Interior enamel undercoat.
      1) Moore:      Moore's Alkyd Enamel Underbody #217.
      2) P & L:      Interior Trim Primer.
      3) S-W:       Pro-Mar 200 Alkyd Enamel Undercoater B49W200.

   b.✱ First and Second Coats:   Interior, semigloss, odorless, alkyd enamel.
   c.✱
      1) Moore:      Moore's Satin Impervo Enamel #235.
      2) P & L:      Cellu-Tone Alkyd Satin Enamel.
      3) S-W:       Classic 99 Semigloss Enamel A40 Series.

2.✱ Satin varnish (Community Building Doors & Trim)

   a.✱First and Second Coats:  Interior Satin Varnish
      1) Moore:      Moore's Benwood Satin Finish Varnish #104
      2) P & L:      77-7 Rez Satin Varnish
      3) S-W:       Oil Based Varnish, Gloss A66V91

D. Ferrous Metal:

1. Semigloss Enamel Finish: Two coats over primer with total dry film thickness not less than 2.5 mils.

ACADEMY HOMES II

SECTION 01040 - PROJECT COORDINATION                    Exhibit F

PART 1 - GENERAL

1.1    RELATED DOCUMENTS

   A.   Drawings and general provisions of Contract, including
        General and Supplementary Conditions and other Division-1
        Specification Sections, apply to this Section.

1.2    SUMMARY

   A.   This Section specifies administrative and supervisory
        requirements necessary for Project coordination including,
        but not necessarily limited to:

        1.   Coordination.
        2.   Administrative and supervisory personnel.
        3.   General installation provisions.
        4.   Cleaning and protection.

   B.   Field engineering is included in Section 01050 "Field
        Engineering".

   C.   Progress meetings, coordination meetings and pre-
        installation conferences are included in Section 01200
        "Project Meetings".

   D.   Requirements for the Contractor's Construction Schedule are
        included in Section 01300 "Submittals".

1.3    COORDINATION

   A.   Coordination:  Coordinate construction activities included
        under various Sections of these Specifications to assure
        efficient and orderly installation of each part of the
        Work.  Coordinate construction operations included under
        different Sections of the Specifications that are dependent
        upon each other for proper installation, connection, and
        operation.

        1.   Where installation of one part of the Work is dependent
             on installation of other components, either before or
             after its own installation, schedule construction
             activities in the sequence required to obtain the best
             results.
        2.   Where availability of space is limited, coordinate
             installation of different components to assure maximum
             accessibility for required maintenance, service and
             repair.
        3.   Make adequate provisions to accommodate items scheduled
             for later installation.

ACADEMY NOMES II

B. Where necessary, prepare memoranda for distribution to each party involved outlining special procedures required for coordination. Include such items as required notices, reports, and attendance at meetings.

    1. Prepare similar memoranda for the Owner and separate Contractors where coordination of their Work is required.

C. Administrative Procedures: Coordinate scheduling and timing of required administrative procedures with other construction activities to avoid conflicts and ensure orderly progress of the Work. Such administrative activities include, but are not limited to, the following:

    1. Preparation of schedules.
    2. Installation and removal of temporary facilities.
    3. Delivery and processing of submittals.
    4. Progress meetings.
    5. Scheduling and coordinating testing services.
    6. Project Close-out activities.

1.4  SUBMITTALS

A. Coordination Drawings: Prepare and submit coordination Drawings where close and careful coordination is required for installation of products and materials fabricated off-site by separate entities, and where limited space availability necessitates maximum utilization of space for efficient installation of different components.

    1. Show the interrelationship of components shown on separate Shop Drawings.
    2. Indicate required installation sequences.
    3. Comply with requirements contained in Section "Submittals."

B. Staff Names: Within 15 days of Notice to Proceed, submit a list of the Contractor's principal staff assignments, including the Superintendent and other personnel in attendance at the site; identify individuals, their duties and responsibilities; list their addresses and telephone numbers.

    1. Post copies of the list in the Project meeting room, the temporary field office, and each temporary telephone.

PART 2 - PRODUCTS (Not Applicable).

PART 3 - EXECUTION

3.1    GENERAL INSTALLATION PROVISIONS

A.  Inspection of Conditions:  Require the Installer of each
major  component  to  inspect  both  the  substrate  and
conditions under which Work is to be performed.   Do not
proceed until unsatisfactory conditions have been corrected
in an acceptable manner.  It shall be the responsibility of
the general contractor to survey and document the condition
of city sidewalks.   The general contractor shall replace
sidewalks damaged due to construction activity.

B.  General contractor shall arrange for a water meter reading
prior to the start of construction.   The general contractor
will turn in existing water meters to Boston Water and
Sewer Commission when building is demolished.    Obtain
receipt and turn copies of the receipts over to Owner.

C.  Manufacturer's Instructions:   Comply with manufacturer's
installation  instructions  and  recommendations,  to  the
extent that those instructions and recommendations are more
explicit  or  stringent  than  requirements  contained  in
Contract Documents.

D.  Inspect materials or equipment immediately upon delivery
and again prior to installation.   Reject damaged and
defective items.

E.  Provide  attachment  and  connection  devices  and  methods
necessary for securing Work.   Secure Work true to line and
level.  Allow for expansion and building movement.

F.  Visual Effects:   Provide uniform joint widths in exposed
Work.   Arrange joints in exposed Work to obtain the best
visual effect.   Refer questionable choices to the Architect
for final decision.

G.  Recheck measurements and dimensions, before starting each
installation.

H.  Install  each  component  during  weather  conditions  and
Project status that will ensure the best possible results.
Isolate  each  part  of  the  completed  construction  from
incompatible  material  as  necessary  to  prevent
deterioration.

I.  Coordinate temporary enclosures with required inspections
and  tests,  to  minimize  the  necessity  of  uncovering
completed construction for that purpose.

J.  Mounting  Heights:   Where  mounting  heights  are  not
indicated,  install  individual  components  at  standard
mounting heights recognized within the industry for the
particular  application  indicated.    Refer  questionable

mounting height decisions to the Architect for final decision.

## 3.2    CLEANING AND PROTECTION

A. During handling and installation, clean and protect construction in progress and adjoining materials in place. Apply protective covering where required to ensure protection from damage or deterioration at Substantial Completion.

B. Clean and maintain completed construction as frequently as necessary through the remainder of the construction period. Adjust and lubricate operable components to ensure operability without damaging effects.

C. Limiting Exposures: Supervise construction activities to ensure that no part of the construction, completed or in progress, is subject to harmful, dangerous, damaging, or otherwise deleterious exposure during the construction period whether caused by the General Contractor's action or inaction.. Where applicable, such exposures include, but are not limited to, the following:

1. Excessive static or dynamic loading.
2. Excessive internal or external pressures.
3. Excessively high or low temperatures.
4. Thermal shock.
5. Air contamination or pollution.
6. Water or ice.
7. Solvents.
8. Chemicals.
9. Light.
10. Radiation.
11. Puncture.
12. Abrasion.
13. Heavy traffic.
14. Soiling, staining and corrosion.
15. Bacteria.
16. Rodent and insect infestation.
17. Combustion.
18. Electrical current.
19. High speed operation,
20. Improper lubrication,
21. Unusual wear or other misuse.
22. Contact between incompatible materials.
23. Destructive testing.
24. Misalignment.
25. Excessive weathering.
26. Unprotected storage.
27. Improper shipping or handling.
28. Security of the Property

END OF SECTION 01040

3.2   FINAL CLEANING

A.  General:  General cleaning during construction is required by the General Conditions and included in Section "Temporary Facilities".

B.  Cleaning:  Employ experienced workers or professional cleaners for final cleaning.  Clean each surface or unit to the condition expected in a normal, commercial building cleaning and maintenance program. Comply with manufacturer's instructions.

   1.  Complete the following cleaning operations before requesting inspection for Certification of Substantial Completion.
      a.  Remove labels that are not permanent labels.
      b.  Clean transparent materials, including mirrors and glass in doors and windows.  Remove glazing compound and other substances that are noticeable vision-obscuring materials.  Replace chipped or broken glass and other damaged transparent materials.
      c.  Clean exposed exterior and interior hard-surfaced finishes to a dust-free condition, free of stains, films and similar foreign substances.  Restore reflective surfaces to their original reflective condition.  Leave concrete floors broom clean.  wax and polish all resilient flooring to manufacturer recommendations.
      d.  Wipe surfaces of mechanical and electrical equipment.  Remove excess lubrication and other substances.  Clean plumbing fixtures to a sanitary condition.  Clean light fixtures and lamps.
      e.  Clean the site, including landscape development areas, of rubbish, litter and other foreign substances.  Sweep paved areas broom clean; remove stains, spills and other foreign deposits.  Rake grounds that are neither paved nor planted, to a smooth even-textured surface.

C.  Pest Control: Engage an experienced exterminator to make a final inspection, and rid the Project of rodents, insects and other pests.

D.  Removal of Protection:  Remove temporary protection and facilities installed for protection of the Work during construction.

E.  Compliance:  Comply with regulations of authorities having jurisdiction and safety standards for cleaning.  Remove waste materials from the site and dispose of in a lawful manner.

END OF SECTION 01700

Exhibit G

# ODF.HOON.PEABODY

A MINORITY CONSTRUCTION JOINT VENTURE
c/o Peabody Construction Co., Inc.
Voice: 781.843.2680 • Facsimile: 781.849.3194

# MEMO

To:   Doug Saunders – Continental         508-778-5758 (15)
      Scott Wilson – HCI/Craftsmen        781-963-1054 (20)
      Jodi – Angelini Plastering          978-664-0771 (16)
      Sal – Cruz Electric                 617-569-6401 (35)
      Artie Dowd – Dowd Plumbing          781-821-3434 (28)
      Boris Kutikov – KDK Enterprises     781-647-0888 (23)

From: Ed Sople

Date: May 4, 2004

Re:   Academy Homes II – SOS / Re-Cleaning Costs

---

I am enclosing for your review 5 SOS slips for additional work associated with
re-cleaning various units on Site A. OHP continues to receive these slips on a
daily basis and I am respectfully requesting that you immediately review the
attached issue with Don Maver and Brian Turley and resolve accordingly.

If you have any questions regarding the above or the attached, please inquire
accordingly.

EJS*lg

cc:   Don Maver –  OHP (36)
      Carroll Cunningham – OHP
      Cleaning Backcharge MF
      R. File



SOS Corp.
"Construction Services"
331 West Street • Milford, MA 01757
Tel: (508) 473-0466 • Fax: (508) 478-4049

G.C. _Peabody_

JOB NAME: _____

JOB ADDRESS: _Roxbury_

JOB PROJECT #: _____

DATE _04 - 12 -04_

WORK PERFORMED:

3 persons 8Hrs each one (recleaning)

(Bldg A/o as noted

TPI -Dave - KTK - CW2 - <</< HC1 - Kenston
30% - 5% - 35%   .5%    5%   10%   4%

| NAME | HRS: | 24 |
|------|------|-----|
| 1. Micaela | | |
| 2. Oscar M | | |
| 3. Walter | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |
| 12. | | |

TOTAL HOURS

24

SIGNATURE _____



$S\!Q\!S$ Corp.

"*Construction Services*"
331 West Street • Milford, MA 01757
Tel: (508) 473-0466 • Fax: (508) 478-4049

G.C. _Peabody_

JOB NAME: _____

JOB ADDRESS: _Roxbury_

JOB PROJECT #: _____

DATE _04-19-04_

WORK PERFORMED:

_2 persons 8 Hrs each nue recleaning_

_Start Recleann A10 - due to_
_all sty dry A11A P-11y_
_B/L as noted_

_Dud - CCC1 - API - KDK - H/1 - CRZ_
_15% 20% 20% 40% 5% 12%_

| NAME | HRS: _16_ |
|------|-----------|
| 1. _Micado G._ | |
| 2. _Oscar M._ | |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |
| 11. | |
| 12. | |

TOTAL HOURS _16_

SIGNATURE _____



**Corp.**

*"Construction Services"*
331 West Street • Milford, MA 01757
Tel: (508) 473-0466 • Fax: (508) 478-4049

G.C. _Peabody_

JOB NAME: _____

JOB ADDRESS: _Roxbury_

JOB PROJECT #: _____

DATE _04-15-04_

WORK PERFORMED:

3 persons 8Hrs each one (recleaning)

Recleaning A10 - Walls 6 mad with
bath - Kitchens due to A11A P-list
B/C as noted
Dud - CCC1 - A21 - KDK - HC1 - Cn2
10§      10§      20§      40§      5§      65§

| NAME | HRS: | (24) |
|------|------|------|
| 1. Micaela | | |
| 2. Oscar | | |
| 3. Walter | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |
| 12. | | |

TOTAL HOURS

SIGNATURE _____   (24)



**SQS** Corp.
*"Construction Services"*
331 West Street • Milford, MA 01757
Tel: (508) 473-0466 • Fax: (508) 478-4049

G.C. _Peabody_

JOB NAME: _____

JOB ADDRESS: _Roxburry_

JOB PROJECT #: _____

DATE _04-16-04_

WORK PERFORMED:

3 persons 8hrs each ove (recleaning)

Recleaning A10 due to sub wiskey
on A14 9-1/4 - B/c as noted

David — CCCl — KJK - Cruz - API - HCl-
10%      10%      40%    5%     3%      5%

NAME:                                    HRS: (24)

1. _Ricardo_

2. _Jose V._

3. _Walter_

4. _____

5. _____

6. _____

7. _____

8. _____

9. _____

10. _____

11. _____

12. _____

TOTAL HOURS (24)



## SCS Corp.
### "Construction Services"
331 West Street • Milford, MA 01757
Tel: (508) 473-0466 • Fax: (508) 478-4049

G.C. _Peabody_

JOB NAME: _____

JOB ADDRESS: _Roxbury_

JOB PROJECT #: _____

DATE _04-20-04_

WORK PERFORMED:

_3 persons 8 hrs. each one re-knowing_

_3 by A10 Final Clean after sth_

_never ending P-list work —_

.P1 — Dond — KDK — Cruz — CCCI — HCI — Keystone
30% 5% 3.5% 5% 5% 10% 10%

| NAME | HRS: (24) |
| --- | --- |
| 1. _Hipolito_ | |
| 2. _José V._ | |
| 3. _Walter_ | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |
| 11. | |
| 12. | |

SIGNATURE _____

TOTAL HOURS (24)

Exhibit H

## Change Orders Status

10/24/2004

| Change Order Name | KDK # | PCC# | Submitted | Processed approved | Unprocessed approved | Dispute GC directed | Notes |
|---|---|---|---|---|---|---|---|
| | 1 | 1 | | | | | |
| | 2 | 1 | | | | | |
| | 3 | | | | | | |
| see other C.O. | 4 | 1 | | | | | |
| see other C.O. | 5 | 1 | | | | | |
| | 6 | 1 | | | | | |
| | 7 | 1 | | | | | |
| | 8 | 1 | | | | | |
| COR 141    1/4 trim | 9 | 5 | $25,960.00 | $25,960.00 | | | |
| | 10 | 1 | $120,000.00 | $120,000.00 | | | |
| | 11 | | | | | | |
| | 12 | | | | | | |
| see other C.O.39 | 13 | | | | | | |
| ASI 68    Col04, flooring revision | 14 | 12 | $1,272.00 | $1,272.00 | | | |
| Boston Interiors A.B.C. | 15 | 6 | $30,000.00 | $30,000.00 | | | |
| anti-grafiti | 16 | 4 | $165,085.00 | $165,085.00 | | | |
| | 16 | 8 | $8,343.00 | $8,343.00 | | | |
| BC /floors | 17 | 8 | -$4,289.08 | -$4,289.08 | | | |
| | | 10 | ?? | | | | |
| void | 18 | | | | | | |
| in KDK #15 | 19 | 6 | | | | | |
| in KDK #15 | 20 | 6 | | | | | |
| void | 21 | | $0.00 | | | | |
| in KDK #15 | 22 | 7 | $7,925.00 | $7,925.00 | | | |
| in KDK #15 | 23 | 6 | | | | | |
| see KDK #16 | 24 | 6 | | | | | |
| see KDK #16 | 25 | 8 | | | | | |
| window sills see #22 | 26 | 7 | | | | | |
| proposed for doors/trim | 27 | | | | | | |
| cor191    voided CH.O's | 28 | | $0.00 | | | | |
| COR181    stair walls/electric. Outlets VOID | 29 | | $0.00 | | | | $13,51 |

Change Orders Status

| 1 | Change Order Name | KDK # | PCC# | Submitted | Processed approved | Unprocessed approved | Gc directed Dispute | Notes |
|---|---|---|---|---|---|---|---|---|
| COR116 | B-4, Premium Time?ED/6/4/04 | 30 | | $3,295.00 | | | | |
| COR116 | B-2, Premium Time | 31 | | $936.00 | | | | |
| | void see PCCI #9 | 32 | | $0.00 | | | | |
| COR116 | B-2, Premium Time | 34 | | $2,845.00 | | | | |
| COR116 | B-2, B-3, Premium Time | 35 | | $5,232.00 | | | | |
| COR116 | B-5, B-3, Premium Time | 36 | | $3,482.00 | | | | |
| | total ## 30 to # 36/prem. $15,790.00 | | | | | $15,790.00 | | OK by ES |
| | Fire Job A13 | | 11 | $216,000.00 | $216,000.00 | | | |
| | B-3, Remobilization | 37 | | $3,972.00 | | | $3,972.00 | b/c HCI |
| | Site B -remobilization | 33 | | $4,536.00 | | | $4,536.00 | b/c HCI |
| CO224 | site A remobilization, doors/frames | 54R | | $24,500.00 | | | $24,500.00 | b/c HCI |
| | Total #33,37,54R /remobil. $33,008.00 | | | | | | | |
| | void | 38 | | $0.00 | | | | |
| COR205 | C.O. 13, laundry | 39 | 14 | $73.00 | $73.00 | | | |
| | access panels | 40 | | $0.00 | | | | |
| | after Fire Prot. | 41 | | $0.00 | | | | |
| | void | 42 | | | | | | |
| | void | 43 | | . | | | | |
| | void | 44 | | | | | | |
| | void | 45 | | $0.00 | | | $0.00 | |
| | door /casing replacement | 46 | | $474.00 | $474.00 | | $0.00 | |
| | exter. Color change | 47r | 9 | $11,233.00 | $11,233.00 | | | |
| COR224 | mold | 48 | | $6,754.00 | | | | ok by ES |
| cor224 | mold | 55 | | $16,816.00 | | | | |
| COR224 | mold | 49 | | $4,345.00 | | | | ok by ES |
| cor224 | mold | 52 | | $10,608.00 | | | | |
| | Total #48,49,52,55 /mold    $ 39,951.00 | | | | | $39,951.00 | | |
| COR224 | repaint | 54 | | $0.00 | | | | |
| | C.O. #54 R see above | 54R | | $0.00 | | | | |
| | see KDK #15 | 53 | 6 | | | | | |
| | variegated Coatings void | 51 | | $0.00 | | | | |
| | variegated Coatings void | 50 | | $0.00 | | | | |

Change Orders Status

| 1 | Change Order Name | KDK # | PCC# | Submitted | Processed approved | Unprocessed approved | Dispute GC directed | Notes |
|---|---|---|---|---|---|---|---|---|
| COR 254 | Proposed /chimney extension | 56 | | $0.00 | | | | |
| | void A10,A11 damages over finishes | 57 | | $0.00 | | | | |
| | Color concrete | 58 | 15 | $9,734.00 | $9,734.00 | | | |
| | tiresholds | 59 | 15 | $620.00 | $620.00 | | | |
| | A10 repaint drywall patches | 60 | | $10,551.00 | | | $10,551.00 | $41,833.00 |
| | A7, A8 screen doors see #8U $604. | 61 | | $0.00 | | | | |
| | void see KDK#16 | 62 | | | | | | |
| COR161 | EL. Outlets | 63 | | $0.00 | | $0.00 | $0.00 | |
| | A11 repaint, drywall patches | 64 | | $7,442.00 | | | $7,442.00 | |
| COR259 | Proposed/ Flue, C1 | 65 | | $0.00 | | | | |
| COR 190 | screen doors  $446.00 see #80 | 66 | | $0.00 | | | | to verify + |
| | heater leak | 67 | 15 | | $958.00 | | | |
| COR266 | A2 heat damage, repaint | 68B | | $9,083.62 | | | $9,088.62 | |
| COR257 | A3 repaint | 68C | | $10,777.16 | | | $10,777.16 | |
| COR 263 | A12  repaint drywall patches | 68 | | $11,285.00 | | | $11,285.00 | |
| | Total #60,64,68,68C/drywall $40,055.16 | | | | | | | |
| COR266 | B1 water damage | 69 | 15 | $542.00 | $542.00 | | | |
| | MDO plywood | 70 | 13 | $12,131.00 | $12,131.00 | | | |
| COR257 | relocation fire alarm boxes | 71 | | $1,011.00 | | $1,011.00 | | to be issued |
| COR 263 | Pipe enclosure | 72 | | | | | | |
| COR263 | Stairways/el.panels | 72RR | | $2,810.56 | | | $2,810.56 | Carroll -NA |
| | | 73 | | $0.00 | | | | |
| | missing ? | 74 | | | | | | |
| COR 266 | Proposed/ added roof | 75 | | $0.00 | | $0.00 | | |
| COR180.1 | proposed/electrical outlets 6/12/03 | 76 | | $0.00 | | $0.00 | | $12,809.00? |
| | proposed/ 6/8/03 | 76R | | | | | | $12,809.20 |
| COR269 | protection/lease board heat was repaired | 77 | | $10,948.00 | | $10,948.00 | | |
| | Credit for railing | 78 | | $0.00 | | | $0.00 | |
| COR 190 | Combination of #78 & #76 | 79 | | $0.00 | | | $0.00 | |
| | Screens including  #61 & #66  (see #83 | 80 | | $0.00 | | | | |
| | Screens including.  B & C(see #83) | 81 | | $0.00 | | | | |
| | OCIP 6/03-7/04 | 82 | | $85,106.25 | | | $85,106.25 | |
| | Screens | 83 | | | | | | |
| CCD 7 | Screens for all sites | 83R | | | | | | |
| | A4  knee wall on T & M | 84 | | $10,226.14 | | $10,226.14 | | to be issued |
| **TOTAL** | | | | **$851,666.65** | **$606,060.92** | **$77,928.14** | **$170,068.69** | |

| 1 | Change Order Name | KDK/PCCIN | | Submitted | Processed approved | Unprocessed approved | Dispute GC directed | Notes |
|---|---|---|---|---|---|---|---|---|
| | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| | TOTAL | | | $851,666.65 | $606,060.92 | $77,928.14 | $170,068.59 | |
| | | | | | | | | |
| | **Backcharges to KDK** | | | | | | | |
| | OCIP | | | | | | -$43,080.00 | |
| | Cleaning 11/11/02-12/2/02 | 2 | | | | | -$10,934.00 | |
| | Cleaning 12/30/02-3/13/03 | 3 | | | | | -$3,716.00 | |
| | Cleaning OHP | | | | | | -$35,000.00 | |
| | Cleaning SOS 8/16/04 | | | | | | -$26,000.00 | |
| | | | | | | | | |
| | Total of BC to KDK | | | | | | -$118,730.00 | |
| | | | | | | | | |
| | Revised total: | | | | | | | |
| | Directed to proceed processed (6) | | | | $606,060.92 | | | |
| | Directed to proceed, not processed (7) | | | | $77,928.14 | | | |
| | | | | | | | | |
| | TOTAL 6+7 | | | | $683,989.06 | | | |
| | **Less By PCCI 9/23/04** | | | | | | | |
| | **Disputed/Directed** (including OCIP 6/3/03-7/04) | | | | $170,310.92 | | $171,068.59 | 9/23/2 |

SECTION 09255 - GYPSUM BOARD ASSEMBLIES                   Exhibit I

PART 1 - GENERAL

1.1   RELATED DOCUMENTS

   A.   Drawings and general provisions of the Contract, including
        General   and   Supplementary   Conditions   and   Division   1
        Specification Sections, apply to this Section.

1.2   SUMMARY

   A.   This Section includes the following:

        1.   Non-load-bearing steel framing members for gypsum board
             assemblies.
        2.   Gypsum board assemblies attached to load bearing wood
             framing
        3.   Cementitious backer units installed with gypsum board
             assemblies.
        4.   Acoustic insulation for demising partitions and tenant
             separation floor assemblies
        5.   Acoustic   sealants   for   track/concrete   at   dimising
             partitions.
        6.   Drywall soffits and chase and duct enclosures.

   B.   Related   Sections:    The   following   Sections   contain
        requirements that relate to this Section:

        1.   Division 6 Section "Rough Carpentry" for the following:
             a.   Wood framing
             b.   Wood blocking in steel and wood stud framed walls
                  and partitions
        2.   Division 7 Section "Building Insulation" Firestopping
             for firestopping systems and fire-resistive-rated joint
             sealants.
        3.   Division 7 Section "Building Insulation"
        4.   Division 9 Section "Gypsum Board Shaft Wall Assemblies"
             for   framing,   gypsum   panels,   and   other   components
             forming shaft wall assemblies.

1.3   DEFINITIONS

   A.   Gypsum Board Construction Terminology:  Refer to ASTM C 11
        and GA-505 for definitions of terms related to gypsum board
        assemblies   not   defined   in   this   Section   or   in   other
        referenced standards.

E.  Levels of Gypsum Board Finish:   Provide the following levels of gypsum board finish per GA-214.

    1.  Level 1 for ceiling plenum areas, concealed areas, and where indicated, unless a higher level of finish is required for fire-resistive-rated assemblies and sound-rated assemblies.

    2.  Level 4 for gypsum board surfaces unless otherwise indicated.

F.  For level 4 gypsum board finish, embed tape in joint compound and apply three separate coats of joint compound over joints, angles, fastener heads, and accessories. Touch up and sand between coats and after last coat as needed to produce a surface free of visual defects and ready for decoration.   Use one of the following joint compound combinations:

    1.  Embedding and First Coat:   Ready-mixed, drying-type, all-purpose or taping compound.
    2.  Fill (Second) Coat:   Ready-mixed, drying-type, all-purpose or topping compound.
    3.  Finish (Third) Coat:   Ready-mixed, drying-type, all-purpose or topping compound.

H.  Where level 1 gypsum board finish is indicated, apply joint compound specified for embedding coat.

3.9   CLEANING AND PROTECTION

    A.  Promptly remove any residual joint compound from adjacent surfaces.

    B.  Provide final protection and maintain conditions, in a manner suitable to Installer, that ensures gypsum board assemblies remain without damage or deterioration at time of Substantial Completion.

END OF SECTION 09255

Exhibit J

ODF.HOON.PEABODY

A MINORITY CONSTRUCTION JOINT VENTURE
C/o Peabody Construction Co., Inc.
Voice: 781.848.2680 • Facsimile: 781.849.3194

# MEMO

To: Boris & Alex – KDK Enterprises, Inc.

Fax: 781-647-0888 (23)

From: Ed Sople

Date: August 2, 2004

Re: Academy Homes II

I am in receipt of your attached 2 letters, one dated July 19, 2004 and one dated July 29, 2004 regarding the completion of the Academy Homes II Project and I offer the following:

<u>July 19, 2004 Letter</u>:

- As of this date, KDK has not provided documentation to support their claim that the OCIP Program was not part of their executed contract.

- With respect to the backcharges for cleaning, I offer the following:

  1. The $10,834 backcharge was associated with 15% of the cleaning that was performed on Site B and was more than reasonable.

  2. The $3,716 backcharge was for work performed by ODF in cleaning KDK's construction debris and all time and materials slips were provided.

  3. The $35,000 backcharge from OHP is actually around $39,000 and the complete breakdown is attached.

KDK authorized OHP to provide a full-time laborer and if you multiply 52 weeks times $1,700/week, the final bill should be around $88,400. Therefore, the backcharges for cleaning are actually extremely low and OHP is currently reviewing all the cleaning bills again, as the numbers do not seem to tie out as OHP did provide a laborer for over a year to KDK.

o With respect to KDK's Change Order Summary, where you note there are $79,423 that have not been processed in a timely manner, I offer the following:

1. Mold Claims totaling $39,951. As you are well aware of, this claim is with the Owner and please keep in mind that the Architect has still not approved your slips and feels like the time submitted was very unreasonable. As OHP has advised, you will be paid on a dollar for dollar basis based on what OHP receives from the Owner.

2. Premium Time totaling $11,000 was previously agreed between KDK and OHP that this cost would be submitted as part of Change Order Request #116, which dealt with delays in permanent power on Site B. Again, KDK agreed to be reimbursed dollar for dollar from what OHP receives from the Owner.

3. HCI backcharges totaling $28,472 and OHP agreed to support KDK's efforts in trying to get reimbursed for these costs, but has continued to advise KDK that these Change Orders were a long shot, as remobilization charges should not total $30,000.

July 29, 2004 Letter:

o OHP disagrees entirely with your letter and the accusation that the project was not scheduled and coordinated properly. The contract correspondence will speak for itself with respect to the lack of coordination and manpower from KDK.

o With respect to your claims for Level 4 vs. Level 5, as of this date, KDK has failed to provide the proper documentation to support this claim.

o With respect to your statement that KDK is losing a great amount of production due to these ongoing issues, as of this date, KDK has failed to provide the proper documentation to support this claim.

I have enclosed an additional copy of the updated Change Order Request Log for KDK's invoices and you should review and revise your Change Order Log accordingly. If you have any questions regarding the above or the attached, please inquire accordingly.

EJS*lg

cc:  Don Maver – OHP (36)            Subcontract Closeout MF
     Carroll Cunningham – OHP
     R. File

**KDK Enterprises, Inc.**
145 Newton Street Waltham, MA 0245᷂ - Tel: (781) 647-4411- Fax: (781) 647-0833

July 29, 2004

VIA FAX/CERTIFIED MAIL: 7002 0860 0004 7539 3653

ODF.HOON.PEABODY
536 Granite Street
Braintree, MA 02184
Attention: Ed Sople

RE:    Academy Homes
       Punch list

You requested that KDK complete buildings outstanding punch list items on A site during this week because tenants will be moving in.

Per my walkthrough of the building I noticed the following:

Building A6:
       #2900, #2902 – The vinyl baseboard fell down and the walls are damaged
       #2896 – Bondo was applied to the finish exterior door

Building A3:
       The drywall tape is exposed

How do you expect us to complete this JOB if you repeatedly request us to do work on surfaces that are not ready for painting?

KDK is not a Maintenance or Management Company.  Our men are getting paid on hourly basis and are supposed to perform work as a painter with production accordingly.

KDK is losing a great amount of production and money due to these on going issues.

If Peabody provided the proper scheduling and coordination and timely direction to KDK to proceed problems would be eliminated.

It is a big Job site and between the Punch List's with "microscopic" items, with "microscopic" representing Level 5 (above our contract obligations), not the Contracted Level 4 items and all the above-mentioned issues, KDK has all rights to seek for reimbursement for expenses incurred.

For last few months KDK has been running throughout the entire Job site, repainting damaged surfaces after other trades have repeatedly made damages to the same Units time and time again.

Peabody has failed to process Change Orders for KDK, which total approximately $100,000.00, nor has submitted payment accordingly.

Please advise KDK on how to proceed with this matter.

Sincerely,

Boris Kutikov
Project Manager

Cc: Don Maver
L.# 144

JUL-19-2004 14:05 FROM:                                    TO:17818493194        P.2/2

# KDK Enterprises, Inc.

145 Newton Street Waltham, MA 02453 - Tel: (781) 647-4411- Fax: (781) 647-0888

July 19, 2004

ODF.HOON.PEABODY
536 Granite Street
Braintree, MA 02184
Attention: Ed Sopie

RE:    UNPROCESSED CHANGE ORDERS
       Academy Homes

Thank you for meeting on July 13, 2004 and your fax received today, July 19, 2004, where you listed summary of change orders to date along with the distribution of KDK "Open" change orders.

Our response is as follows:

1. KDK completely disagrees with the deductions for the OCIP Program, which you were previously informed that we strongly feel this does not apply to our contract obligations. KDK will issue a change order for any expenses regarding insurance (OCIP) for contract work performed after 06.06.03.

2. Back charges for cleaning ($10,834.00, $3,716.00, $35,000.00) appear to be ridiculously high, particularly after our evaluation of the man hours charged, revealed some weekly hours totaled 63-83.

3. Reviewing KDK's Change Order Summary and your summary we don't understand why a significant amount of change orders were not processed in a timely manner and were staying as "Open C.O."s a few examples are listed below:

   - Mold C.O. 48, 49,52 and 55          $39,951.00
   - Premium time Approx.                $11,000.00
   - C.O. 37 & 54R B/C to HCI            $28,472.00
                                         $79,423.00

I feel it is only fair to process the oldest "Open" change orders and add them to our Contract as soon as possible or at least to put the disputed back charges on hold.

Sincerely,

Alex Dorjets
Vice-President
SENT BY FAX TO MAIN OFFICE & SITE

## CERTIFICATE OF SERVICE

I, James G. Grillo, hereby certify that on this 25th day of September, 2006, I served a

copy of: **Plaintiff, KDK Enterprise's Motion to File Reply and Reply in Support of**

**Summary Judgment on Count 1 of the Complaint**, via first class mail, upon:


Bradford R. Carver, Esq.
Hinshaw & Culbertson LLP
One International Place, 3rd Floor
Boston, MA 02110


James G. Grillo, Esq.